682 A.2d 1143

**OWENS–CORNING FIBERGLAS CORPORATION, et al.**

v.

**Ralph GARRETT, et al.**

**No. 117, Sept. Term, 1995.**

Court of Appeals of Maryland.

Aug. 28, 1996.

Reconsideration Denied Oct. 4, 1996.

**502**

⊙—63

504

Gregory L. Lockwood (John P. Sweeney, Douglas B. Pfeiffer, Miles & Stockbridge, on brief); Lawrence L. Hooper (Scott Patrick Burns Tyding & Rosenberg L.L.P., on brief); and Warren N. Weaver (Louis G. Close, Jr., Padraic McSherry Morton, Whiteford, Taylor & Preston, L.L.P., on brief), Baltimore, for appellants.

Peter T. Nocholl, Baltimore (Ann Ritter, Ness, Motley, Loadholt, Richardson & Poole, Charleston, SC; Patrick S. Guilfoyle, Washington, DC, on brief); and Shepard A. Hoffman (Brian C. Parker, Kenneth R. Rhoad, Gebhardt & Smith, on brief) Baltimore, for appellees.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

KARWACKI, Judge.

The plaintiffs/appellees brought suit in the Circuit Court for Baltimore City against numerous manufacturers and distributors of asbestos products, alleging negligence and strict liability for failure to warn of the dangers of the asbestos products. Two of the plaintiffs were men suffering from asbestos-related mesothelioma, and another was the surviving wife of a man

who had died of mesothelioma. Their cases were consolidated for trial.[1] Today we address the numerous issues raised in appeals from judgments entered following the consolidated trial, in which three of the direct defendants were found liable by the jury for varying amounts of compensatory damages and punitive damages were assessed against one of those defendants. We affirm all the liability verdicts and the compensatory damages awarded by the jury, and reverse the punitive damages award for lack of sufficient clear and convincing evidence of actual malice.

## I.

### A. Overview

These suits were brought to recover damages resulting from asbestos exposure experienced by Harvey Scruggs, Ralph Garrett, and William Hohman. All three men worked with or near asbestos products for several years in a variety of jobs, described in more detail in the following paragraphs and later in the opinion when relevant to our analysis. Mr. Scruggs and Mr. Garrett, still alive when suit was instituted, have since died of malignant pleural mesothelioma, a rare form of cancer believed by medical experts to be caused almost exclusively by exposure to and inhalation of asbestos dust.[2] Lenora Scruggs,

---

**1.** The trial grouping also included plaintiffs Norman Hannon, Jr., Saul Holland, and Edward Wojciechowski. Their cases are not before us.

**2.** The membrane surrounding the lungs is called the viscera pleura, which is made up of mesothelial cells. Malignant pleural mesothelioma is the occurrence of malignant tumors in the pleura. Although mesotheliomas can be benign (rarely) and can occur in other membranes or linings made up of mesothelial cells, such as the pericardium surrounding the heart or the peritoneum surrounding the stomach, the simple term "mesothelioma" commonly denotes a malignant pleural tumor. *See Stedman's Medical Dictionary,* (26th ed. 1995); *Dorland's Illustrated Medical Dictionary,* (28th ed. 1994); *The American Medical Association Encyclopedia of Medicine* (Charles B. Clayman, M.D., ed., 1989).

In 1964, after decades of theorizing and research on what causes mesothelioma, a seminal epidemiological study published in the *Journal of the American Medical Association* essentially confirmed that asbestos

as personal representative of Mr. Scruggs' estate,[3] and Louis Bittner, as personal representative of Mr. Garrett's estate, were substituted as plaintiffs at trial and are appellees in this case. Mr. Hohman died in 1986 of mesothelioma and his wife Jeanette instituted suit both as personal representative of his estate and on her own behalf; she too died during trial and the personal representative of her estate, her daughter, Victoria Croghan, was substituted as a plaintiff in her mother's wrongful death action and as the successor personal representative of the estate of William Hohman. She is the third appellee in this case. For convenience, however, we will refer to the three men who died of mesothelioma, rather than their personal representatives, when discussing the issues presented in this appeal.[4]

The three defendants/appellants before us are Owens–Corning Fiberglas Corporation (hereinafter "OCF"), Porter Hayden Company (hereinafter "PH") and Owens–Illinois, Inc. (hereinafter "OI"). PH was an insulation distributor and installer in industrial facilities around Baltimore. OCF and OI manufactured and distributed products containing asbestos, notably pipe and boiler insulation. From the late 1940's

---

is a primary cause. The study of asbestos insulation workers showed that, after more than twenty years from the beginning of the study participants' exposure to asbestos, these workers "sustained grossly excessive mortality from lung cancer, mesothelioma, and gastrointestinal cancer...." Barry I. Castleman, *Asbestos: Medical and Legal Aspects*, (1990), citing I.J. Selikoff, et al., "Asbestos Exposure and Neoplasia," 188 *JAMA* 22–26 (1964). An extensive overview of Dr. Selikoff's study appears in a recent opinion of this Court, *ACandS, Inc. v. Godwin*, 340 Md. 334, 363–64, 667 A.2d 116, 130 (1995).

Asbestos is a fibrous mineral mined in Africa, Italy, and elsewhere, useful for its significant heat resistance qualities. Workers inhale asbestos fibers, which cannot be effectively filtered by the lungs' natural protective mechanisms because they are too small. Exactly how the fibers cause malignancy in the mesothelial cells is not known.

3. Lenora Scruggs had also joined her husband in a claim for loss of consortium in the original complaint.

4. In part III, section E, *infra*, we discuss specific legal issues concerning Victoria Croghan's substitution for the late Jeanette Hohman in Jeanette Hohman's wrongful death suit.

to 1953, OI manufactured and distributed Kaylo, an insulation material containing asbestos. From 1953 to 1958, although OI was still the manufacturer of Kaylo, OCF distributed the product; in 1958, OCF bought the Kaylo manufacturing facility from OI and continued to manufacture and distribute Kaylo until 1972, when asbestos-free Kaylo was introduced. The other direct and cross-claim defendants in this consolidated case are not parties to this appeal, although liability of cross-claim defendants is an issue and will be addressed in part III, section B, *infra*.

### B. *Harvey Scruggs*

From 1968 to 1972, Mr. Scruggs was an equipment mechanic apprentice and journeyman at the Curtis Bay Coast Guard Shipyard in Baltimore as a civilian employee of the Navy. In 1970, for a two-month period of time, Mr. Scruggs was also trained to be and worked as a pipecoverer. During those four years, according to his own testimony, he worked mostly in the boiler and engine rooms of Coast Guard cutters, exposed daily to asbestos products:

"Q. When you were working in the engine and boiler rooms, Mr. Scruggs, did the dust from the asbestos products get in your hair?

A. Yes, sir.

Q. Did it get in your nose?

A. Yes.

Q. Did it get in your mouth?

A. Some of it did.

Q. What did your clothes look like at the end of any particular day?

A. Dusty. My face was dusty, my glasses were dusty, my hair was dusty."

Mr. Scruggs testified at trial that the asbestos dust came in part from the daily sawing and cutting of OCF Kaylo, an insulation available in block and pipecovering form, in the boiler rooms in which he worked. Kaylo was described thus in a 1956 marketing brochure produced by OCF:

"Kaylo® Block Insulation, a white, rigid hydrous calcium silicate heat insulation developed and manufactured by Owens–Illinois Glass Company and distributed nationally by Owens–Corning Fiberglas Corporation, effectively insulates indoor and outdoor heated equipment up to 1200 ° F. Kaylo Block Insulation offers excellent heat insulation, high strength and moisture resistance to a variety of high temperature installations. A chemically-reacted material, it contains asbestos fibers for reinforcement."

Kaylo contains approximately 15% asbestos. Jerry Helser, quality control supervisor at the Kaylo plant in Berlin, New Jersey in the 1960's, testified that asbestos fibers were critical to the production of Kaylo. Asbestos served as a reinforcement, or a bonding agent, to hold together in solid block form the variety of minerals which, when combined and heated under pressure in an autoclaving process, reacted to form the hydrous calcium silicate. The dust created by cutting or sawing Kaylo contained asbestos fibers which could be inhaled.

Mr. Scruggs and a co-worker, Donald Kaiser, also testified to seeing PH trucks at the shipyard delivering asbestos materials, including Kaylo and the products of a number of the cross-claim defendants.

After 1972 the areas of the ships where asbestos pipecovering was used were off-limits to all workers except those who actually installed the pipecovering. Mr. Scruggs continued working for the Navy in a series of office jobs until December of 1992, three months after he had been diagnosed with mesothelioma. He died during the trial, after testifying in a videotaped deposition and in the courtroom.

C. *Ralph Garrett*

In 1942, Ralph Garrett worked full-time for approximately a year as a pipecoverer for Maryland Shipbuilding and Drydock, using a variety of asbestos pipecovering, block, and cement insulation products on the ships in the yard. In his videotaped deposition shown to the jury, Mr. Garrett described the dust created in using the block insulation:

"Q. Mr. Garrett, do you recall what was—what type of work was done with this asbestos pipecovering that you have referred to? How was it used?

A. Well, it was put on pipes and joints of any such kind, which would be put mud around that. And if it were a big joint, they would put pieces of block on it and put the mud around it to hold, make it a form. *And you would have to saw this stuff, and it would make you look like a snowman. That would keep you white all day long, from the time you got there until you left.*

Q. Mr. Garrett, do I understand that you, yourself, sawed this insulation?

A. Oh, yes."

(Emphasis added.) During that time, according to his testimony and that of a co-worker William Moody, he used Kaylo pipecovering and block insulation, as well as other asbestos products.

Mr. Garrett then went to work as an electrician, and testified that around 1950, for approximately one year, he worked on a job at Crownsville Hospital near co-workers who were covering pipes using asbestos products and creating asbestos dust which got on his clothes. He identified during his deposition the products used as "some of the ones that we have said before." This statement apparently referred to his testimony about materials at Maryland Shipbuilding and Drydock; Garrett did specifically but tentatively mention Kaylo.

In 1955 he went to work for Western Electric as an electrician, where he worked for the next thirty years. During his tenure at Western Electric, Mr. Garrett regularly used and cut gasket material containing asbestos. His work with the gasket material created a small amount of asbestos dust, but Mr. Garrett also worked overtime weekends at least twice per month as a pipecoverer for Western Electric; it was on these shifts that he was exposed to asbestos dust from the pipecovering and the "mud" (the cement containing asbestos) used to seal the joints of the pipes. He again identified the brand names of the products they used for pipecovering at Western

Electric as the same products he had used at Maryland Shipbuilding and Drydock in 1942. His co-workers who testified at trial also identified Kaylo as one of the products used.

Mr. Garrett tentatively identified PH as one of the insulating contractors he worked with and around. One witness, John Lantz, also testified that PH was an outside contractor performing insulation work at Western Electric during 1957–59, installing asbestos pipecovering among other tasks.

Mr. Garrett developed mesothelioma in 1993, and died before trial.

D. *William Hohman*

William Hohman worked for Continental Oil Company (hereinafter "Conoco") from 1952 until his retirement in 1986. His variety of jobs included mechanic helper, loader helper, loader, gauger, braker for the engineers, fire equipment man, and safety inspector. As Mr. Hohman died of mesothelioma in 1986, his co-workers had to testify at trial to the frequency and proximity of Mr. Hohman's exposure to asbestos products and asbestos dust. Otto Biden, who worked as a steamfitter in the "boiler house" at Conoco, described Mr. Hohman's exposure as essentially constant, testifying that "Bill Hohman, William Hohman was there on every job that was even done at Continental Oil" in the boiler house, where asbestos was in constant use.

Because not all the witnesses at trial knew Mr. Hohman, plaintiffs put on evidence from which his exposure could be inferred. Eyewitnesses identified exactly which asbestos products and suppliers were present at the Conoco plant during Mr. Hohman's tenure. Documentary evidence of plant operations also confirmed the purchase of certain products, including Kaylo. We review the factual evidence in Mr. Hohman's case in depth in part III, section C of the opinion, but note preliminarily that some of the witnesses stated that Kaylo was in use at Conoco during the relevant time period.

## E. *Trial History*

The original complaints of the plaintiffs named dozens of defendants, who were all deemed automatically to be cross-claim defendants as well [5]; only the three defendants/appellants before us today were found liable. Presentation of evidence in the consolidated trial began on April 7, 1994. Almost four months later, on July 22, 1994, the jury returned its verdicts. In the case of Harvey Scruggs, the jury found OCF and PH jointly and severally liable in negligence and strict liability for compensatory damages in the amount of $3.5 million. In the Garrett case, OCF and PH were found jointly and severally liable for compensatory damages of $1 million. In the Hohman case, the jury found all three appellants before us, OCF, OI and PH, jointly and severally liable for compensatory damages of $1.5 million. No cross-claim defendants were found liable for contribution. Finally, the jury assessed puni-

---

**5.** All named direct defendants are automatically deemed to have cross-claimed against each other for contribution or indemnity. *See Joint Master Pre-trial Order, In re: Baltimore City Personal Injury and Wrongful Death Asbestos Cases,* File No. 89236704. In the instant case, dozens of defendants were directly sued initially, but only a handful remained as direct defendants when the jury was considering its verdicts. The remainder of the defendants settled the claims or were dismissed for other reasons during the pre-trial period and the pendency of the trial. Some entered bankruptcy. Some, but not all, remained in the case as cross-claim defendants only.

In the Hohman case, OCF, OI, and PH, as well as Anchor Packing and Garlock were direct defendants at the end of the trial. ACandS, Armstrong World Industries, Babcock & Wilcox, Combustion Engineering, Fibreboard, GAF Corporation, and Pittsburgh Corning were cross-claim defendants. Anchor Packing and Garlock were found not liable, and they are not involved in this appeal.

In the Scruggs case, OCF, PH and Crane Packing were direct defendants at the end of the trial. ACandS, Anchor Packing, National Gypsum, Armstrong World Industries, Fibreboard, Foster Wheeler, GAF Corporation, Garlock, and Pittsburgh Corning were cross-claim defendants. Crane Packing was found not liable and is not involved in this appeal.

In the Garrett case, OCF, PH and Crane Packing were direct defendants. ACandS, Anchor Packing, Armstrong World Industries, Fibreboard, Foster Wheeler, GAF Corporation, Garlock, General Electric, Owens–Illinois, Pittsburgh Corning and Westinghouse were cross-claim defendants. Crane Packing was found not liable and is not involved in this appeal.

tive damages of $1.5 million against OCF only in the Scruggs case. OCF and OI moved for judgment notwithstanding the verdict and, in the alternative, a new trial; PH moved for a new trial in the cross-claims proceedings only. The trial judge denied all post-trial motions. Defendants noted their respective appeals to the Court of Special Appeals; we issued a writ of certiorari on our own motion before the cases were briefed in the intermediate appellate court.

## II.

Certain of the issues before us are common to all three defendants/appellants, but each appellant also poses questions unique to itself. We present the questions here in the order and groupings in which we shall address them:

A. Did the trial judge abuse his discretion in failing to declare a mistrial based on potentially prejudicial events which occurred during trial and improper remarks during plaintiffs' closing arguments?

B. Were the jury verdicts in favor of all cross-claim defendants against the weight of the evidence, and were the special verdict sheets unfairly prejudicial to the direct defendants?

C. Was there legally sufficient evidence to sustain the jury's finding that OI Kaylo was a substantial contributing factor in Mr. Hohman's mesothelioma?

D. Should the jury's verdicts of compensatory damages against the three defendants/appellants be reduced by the amount of the settlements between plaintiffs and other defendants?

E. Did Mrs. Hohman's claim for the wrongful death of Mr. Hohman abate upon Mrs. Hohman's death?

F. Was there legally sufficient evidence, using a clear and convincing evidentiary standard, of actual malice on the part of OCF in the Scruggs case to sustain the jury's assessment of punitive damages against OCF?

G. Were the trial judge's jury instructions on punitive damages proper? Moreover, did the trial judge violate OCF's

due process rights when he failed to conduct a post-verdict review of OCF's liability for punitive damages? Finally, was the evidence legally sufficient that the twin goals of punishment and deterrence were furthered by the jury's assessment of punitive damages against OCF?

## III.

### A. *Motions for Mistrial*

■ Defendants/appellants in this case complain that the trial judge abused his discretion in failing to declare a mistrial based on prejudicial events which occurred during trial and improper remarks during plaintiffs' closing arguments. Although we do not condone the conduct of plaintiffs' attorneys, under the circumstances we do not find an abuse of discretion. We shall summarize the parties' arguments, then set forth the applicable law and our analysis.

OCF, OI, and, by adoption, PH, first contend they were irreparably prejudiced by the highly improper closing arguments of plaintiffs' attorneys, who, in the words of defendants, "repeatedly hurled criminal accusations and invectives" at them. Although the trial judge sustained several objections, warned the plaintiffs' counsel, and issued two curative instructions, defendants further complain that the trial judge's efforts to put a halt to the plaintiffs' conduct were "pathetically inadequate."

For example, counsel in Mr. Hohman's case stated in closing argument:

"This is a case of enormous proportions. The conduct of the defendant, of all of these defendants, is of great seriousness. If it were a criminal case, some of them would be on trial for murder."

The trial judge sustained the objections to counsel's phrasing, and stated, "Let's not mention any criminal activity," but did not issue a curative instruction to the jury at that time. Hohman's counsel went on immediately to describe his decedent's death:

"The enormity of the injuries here is almost beyond description. The horrors of slow and painful wasting, suffocating, starving death. The worst features of what happened here are the way Mr. Hannon, Mr. Hohman, Mr. Garrett and Mr. Scruggs were tortured on the way to dying. It's worse than being shot, worse than being beaten to death. They suffered unmercifully from between six months to two years."

Minutes later, despite the trial court's instructions, the same counsel alluded once again to the criminality of the defendants:

"[The defendants' lawyers] use what they call the TLV defense, the threshold limit value.[6] You know, if someone were to go to work every day, if someone were to go to work every day and poison the boss until the boss died, you know what they would call that. But if the asbestos company poisons a worker a little bit every day, they call it a threshold limit value."

He then accused the defendants of "deliberate, cold-blooded disregard for life."

Moreover, plaintiffs' counsel analogized the defendants to "villains," and further compared the defendants' recordkeeping to the recordkeeping of the Nazis during the Holocaust. They described the disease of mesothelioma dramatically, claiming that it "stalked" its victims, took them "hostage" and "robbed" them of life. Finally, one counsel stated that the defendants "stole" the lives of the plaintiffs.

The trial judge overruled most objections made to these comments by plaintiffs' counsel. He denied a motion for mistrial made several hours after one plaintiff's counsel's use of the term "murder," stating that there was

"no manifest necessity for granting a mistrial. The Court sustained the objection as soon as it was made. And I might parenthetically state that there was no request for a curative comment to the jury, which the Court would have made had one been made. And additionally, even if there

---

**6.** See part III, section F for a discussion of "threshold limit value."

was at that time a manifest necessity, counsel have waived that by letting it pass until now."

One of the defendants' counsel then requested an immediate curative instruction, a request which was joined by some but not all of the other defense counsel. The attorney who did not join in the request expressed concern that giving the curative instruction so long after the improper remark would "make matters worse," a concern which the trial judge apparently heeded as he made only a veiled reference to the improper remark:

"Members of the jury, there was an objection during Mr. Hoffman's opening argument, and I sustained that objection. Disregard the comments that were made by Mr. Hoffman at that time. We advise you that you should disregard those comments."

Finally, after closing arguments and just before the jury began its deliberations, the trial judge reiterated his curative instruction, saying to the jury, "Comments made analogizing this case to criminal cases are improper and must be totally disregarded by you in your deliberations."

OCF also argues that the prejudice to its case from the improper remarks of opposing counsel was compounded by other circumstances which occurred during the trial, rendering a fair trial impossible.

Mrs. Hohman, decedent William Hohman's wife who was pursuing his claims and her own in the trial, died of a heart attack during the trial (not in the courtroom). The trial judge determined that the jury members had a right to know of her death and informed them; the transcript reflects "gasps" from the jury. All defendants moved for a mistrial at that time, which was denied.

Mr. Scruggs, who had appeared in court to testify only weeks earlier, also died during the trial. Defendants objected to the trial judge's decision to inform the jury of his death as highly prejudicial, but the trial judge determined that the jurors needed to know of Mr. Scruggs' death and informed them. The transcript again reflected "sighs" and "gasps"

from the jurors. Defendants' motion for a mistrial was again denied.

In addition to the deaths of two plaintiffs occurring during the trial, proceedings were halted for three weeks while the trial judge was ill; one of the plaintiffs' witnesses, William Whitley, experienced chest pains while testifying, left the stand abruptly, and had to be removed from the courthouse by ambulance; and finally, OCF's lead counsel had to withdraw from representation halfway through the trial for family reasons. After each of these instances defendants moved for a mistrial, which was denied each time. The judge explained at length to the jury the circumstances behind Mr. Whitley's sudden illness on the stand.

All of these incidents, according to OCF, "contaminated the trial" and, in combination with the prejudicial remarks of which all defendants complain, "transcended any curative effect of the trial court's cautionary instructions."

As evidence of the prejudice they suffered, defendants point to the failure of the jury to find any cross-claim defendant liable, attributing the jury's findings in part to the vitriolic attacks directed by plaintiffs' counsel only at the direct defendants. Defendants maintain that evidence of the plaintiffs' exposure to the products of certain cross-defendants was far greater than the evidence against the direct defendants, and therefore that the jury's verdict for the cross-defendants and against the direct defendants "must be interpreted as the result of the prejudicial and improper attacks by plaintiffs' counsel."

■ In reviewing the trial judge's denial of a mistrial motion, we will not disturb the ruling absent a clear showing of abuse of discretion. *Medical Mut. Liab. Ins. Soc'y v. Evans*, 330 Md. 1, 19, 622 A.2d 103, 112 (1993); *State v. Hawkins*, 326 Md. 270, 277, 604 A.2d 489, 493 (1992); *White v. State*, 300 Md. 719, 737, 481 A.2d 201, 210 (1984); *Jacobson v. Julian*, 246 Md. 549, 561, 229 A.2d 108, 116 (1967). When trial judges exercise discretion, they "balanc[e] alternative solutions and decid[e] which one to apply, in order to advance the

interests of justice." *McCloud v. State*, 317 Md. 360, 367, 564 A.2d 72, 75 (1989); *Colter v. State*, 297 Md. 423, 426–31, 466 A.2d 1286, 1288–90 (1983).

■ Our first question in determining abuse of discretion in denying a mistrial motion is if and to what extent the movant was prejudiced by the denial. *See Evans*, 330 Md. at 19–20, 622 A.2d at 112; *Rainville v. State*, 328 Md. 398, 408, 614 A.2d 949, 953 (1992); *Jacobson*, 246 Md. at 561, 229 A.2d at 116. As we stated in *Evans* and repeated most recently in *ACandS, Inc. v. Godwin*, 340 Md. 334, 667 A.2d 116 (1995),

> " 'Where the [motion for a mistrial] is denied and the trial judge gives a curative instruction, we must determine whether the evidence was so prejudicial that it denied the defendant a fair trial; that is, whether the damage in the form of prejudice to the defendant transcended the curative effect of the instruction.' "

*Godwin*, 340 Md. at 407, 667 A.2d at 152 (citing *Evans*, 330 Md. at 19, 622 A.2d at 112).

In the instant case, we regard certain of the remarks of plaintiffs' counsel as oratorical flourishes, melodramatic but not prejudicial to the defendants. Using alarming terms such as "robbed," "stole," "hostage" and "stalked," although not approved, are not likely to influence a reasonable jury unfairly.

We admonish plaintiffs' counsel for their repeated references to murder and analogies to "Nazis" and the "Holocaust." Such terms are unduly inflammatory; moreover, they raise certain images and specters which could be extremely upsetting and unfairly influential to jurors who may have personal experience with the persons and events behind the terms so carelessly tossed about in the courtroom. As the Court of Special Appeals stated in *Alexander & Alexander, Inc. v. B. Dixon Evander & Assoc., Inc.*, 88 Md.App. 672, 596 A.2d 687 (1991), *cert. denied*, 326 Md. 435, 605 A.2d 137 (1992),

> "There is no need for snide remarks, pejorative, and unfounded hyperbole or exaggeration . . . The search for

truth, which is supposedly the principal function of a trial, is assisted much more by light than by heat."

*Id.* at 704, 596 A.2d at 702–03. *See also Keene Corp. v. Hall,* 96 Md.App. 644, 666–67, 626 A.2d 997, 1009 (1993).

Despite the improper nature of certain remarks in plaintiffs' closing arguments, we do not find overall that defendants were unfairly prejudiced such that the trial judge abused his discretion in failing to grant a mistrial. First, the trial judge actively sought to remedy the problem with two separate curative instructions; moreover, he is correct in noting that defendants' counsel did not request a curative instruction as they should have, nor did defense counsel request a mistrial at the proper time during the trial.

Second, the jury sat through four months of trial testimony and exhibits, sifted through reams of documents, and heard hours of closing arguments. We do not believe the utterance of a few improper words and phrases, while unquestionably a conscious attempt to inflame the passions of the jury, was enough to cancel out the jury's search for truth among the voluminous evidence. To hold otherwise would be to manifest an unfair mistrust of the jury and its ability to separate rhetoric from fact.

Finally, although we wish heartily to discourage exactly the type of argument plaintiffs' counsel made in this case, we cannot justify remanding for a new trial a four-month case with eighteen boxes of record and thousands of pages of transcript when overall the case was extremely well-tried. We do not mean to imply in any way that counsel in future cases should assess the performance of the trial judge and then determine whether it is safe to indulge in improper remarks; to the contrary, although we are unwilling to find undue prejudice here, another case in which unfairly prejudicial argument rears its ugly head might result in the opposite outcome. We simply mean that the trial judge did not abuse his discretion when he evaluated the conduct of the entire four-month trial, weighed the improper remarks against that

backdrop, and determined that granting a mistrial would not be just.

OCF's complaint about other prejudicial events during trial is barely worth comment. Mr. Scruggs was obviously dying of cancer, a fact of which the jury was fully aware; his death during the trial was hardly prejudicial and most certainly had to be communicated to the jury. Mrs. Hohman's death, while unexpected, was not prejudicial in any way we can discern, and OCF gives us no assistance. OCF merely states in conclusory fashion that the trial was "contaminated" but does not explain how or why, nor does OCF explain how the other unforeseen events during the trial caused it unfair prejudice. We find it extraordinary that OCF complains in one breath that the trial judge was ill for three weeks and asserts his illness as a foundation for mistrial, and in the next breath asks for a mistrial based on *its own counsel's* personal reasons for withdrawing from the case (the premature birth of his son). OCF's argument that the numerous unfortunate events which occurred during trial were unfairly prejudicial lacks merit entirely.

Nor are we remotely persuaded that the jury verdicts in favor of the cross-defendants are proof of unfair prejudice. As we discuss in the next section, from the facts presented during trial, a reasonable jury could easily have believed that the direct defendants were liable and the cross-defendants were not. Moreover, as we said earlier, this argument implicitly denigrates the jury by assuming that the few inflammatory remarks made about direct defendants would so cloud its judgment that jurors would render verdicts against the weight of the facts presented. We have no such suspicion that the jury would be so easily swayed by emotion that it would forsake its sworn duty, especially after four months' investment of time and energy.

## B. *Cross–Defendants' Liability*

OCF and PH ask us to find that the jury verdicts in the Garrett, Scruggs, and Hohman cases in favor of all cross-

defendants were "against the weight of the evidence." They contend that during closing arguments plaintiffs' counsel made "binding admissions" that sufficient evidence of liability against cross-defendants had been introduced. In addition, PH makes an extensive argument, adopted by OCF, that the verdict sheets were unfairly written so as to favor the cross-defendants and prejudice the direct defendants, and asks us to find that the trial judge abused his discretion by not granting PH's motion for a new trial on the cross-claims. Their arguments are not persuasive.

■ Our first order of business is to reiterate longstanding Maryland law that it is not the province of an appellate court to express an opinion regarding the weight of the evidence when reviewing judgment on a jury verdict. *See Fowler v. Benton*, 245 Md. 540, 545, 226 A.2d 556, 560 (1967) (judging weight of evidence is the province of the jury alone); *Gray v. Director of Patuxent Inst.*, 245 Md. 80, 84, 224 A.2d 879, 881 (1966); *Benkoe v. Plastic Assembled Prod.*, 231 Md. 419, 420, 190 A.2d 638, 639 (1963) ("When properly reserved, we pass upon the sufficiency of evidence to take a case to the jury, but we do not review the weight of the evidence after it has been passed upon by the jury"); *Aetna Cas. & Sur. Co. v. State*, 162 Md. 49, 56, 158 A. 45, 48 (1932); *Stouffer v. Alford*, 114 Md. 110, 116, 78 A. 387, 389 (1910); *Fraidin v. Weitzman*, 93 Md.App. 168, 193–94, 611 A.2d 1046, 1059 (1992), *cert. denied*, 329 Md. 109, 617 A.2d 1055 (1993). Even if a jury verdict is "inconsistent" in the sense that certain findings of fact cannot logically be reconciled with each other, we will normally not reverse a jury's verdict either in a civil or a criminal case. *Mack v. State*, 300 Md. 583, 594, 479 A.2d 1344, 1349 (1984); *Eagle–Picher Indus., Inc. v. Balbos*, 84 Md.App. 10, 35–36, 578 A.2d 228, 240 (1990); *Steffey v. State*, 82 Md.App. 647, 662, 573 A.2d 70, 77 (1990).

■ Thus, almost as a matter of hornbook law, we reject defendants' argument regarding the weight of the evidence. We refuse to re-evaluate the evidence and invade the territory of the jury. The evidence against cross-defendants was suffi-

cient to be submitted to the jury, and in any case obviously defendants/appellants would not wish to make an argument of insufficiency. Beyond that, the jury and the jury only has the power to assess the weight of the evidence, a power which passes to the trial judge's discretion upon motion for a new trial. *Weissman v. Hokamp*, 171 Md. 197, 201, 188 A. 923, 925 (1937).

Lest we are suspected of merely misinterpreting defendants/appellants' apparent argument that we ought to reweigh the evidence presented to the jury, we note that we thoroughly combed both sets of briefs (each defendant/appellant adopted the other's argument) and our transcript of oral argument to ensure that our reading was correct. Perhaps, for example, the phrase "against the weight of the evidence" was being used as a less than precise way of saying the trial judge abused his discretion in not granting a motion for a new trial on the cross-claims (as PH actually argues) rather than simply as a legal term of art. We quote the subheading from the OCF brief:

"THE JURY'S FAILURE TO FIND EVEN ONE CROSS-DEFENDANT LIABLE FOR CONTRIBUTION WAS AGAINST THE WEIGHT OF THE EVIDENCE."

OCF went on to summarize (but in some detail) the evidence against the cross-defendants in each case, and argued in conclusion that the jury's failure to find even one cross-defendant liable "plainly was against the weight of the evidence, and requires entry of judgment in favor of Owens-Corning against these cross claim defendants, or alternatively, a remand for a new trial." OCF and PH "plainly" misunderstand basic appellate review of judgments on jury verdicts.

We also note that we are mystified by OCF's insistence that plaintiffs made "binding" admissions as to the liability of cross-defendants during argument. The plaintiffs' counsels could not "bind" the jury, nor parties whom they did not represent, to liability simply because they argued to the jury that they had introduced sufficient evidence to hold certain cross-defendants liable. OCF's position is illogical; the jury

was clearly capable of disagreeing with the plaintiffs' assessment of the weight of the evidence in the case, and apparently did so.

■ OCF and PH allege two defects in the verdict sheets. First, liability of direct and cross-defendants was treated separately on the verdict sheets for each plaintiff's case; defendants argued that all defendants, regardless of party status, should be included in a single set of questions.[7] Other-

---

7. The verdict sheet in Mr. Hohman's case provides an example of the separate questions treating direct defendants and cross-claim defendants:

 4. Has Plaintiff proven by a preponderance of the evidence that any of the listed parties or their predecessors were negligent in the manufacture, supply, installation and/or distribution of any asbestos-containing products? (Negligence.)

| | | | Yes | | No | |
|---|---|---|---|---|---|---|
| a) | Anchor Packing | - | Yes | | No | X |
| b) | Garlock | - | Yes | | No | X |
| c) | Owens–Corning Fiberglas | - | Yes | X | No | |
| d) | Owens–Illinois | - | Yes | X | No | |
| e) | Porter–Hayden | - | Yes | X | No | |

 13. In regard to the cross-claims asserted by cross-plaintiffs, do you find that they have proven by a preponderance of the evidence that any of the cross-defendants were negligent in manufacturing, supplying, installing and/or distributing asbestos-containing products to which Mr. Hohman was exposed and which substantially contributed to Mr. Hohman's mesothelioma? (Negligence.)

| | | | Yes | | No | |
|---|---|---|---|---|---|---|
| a) | ACandS, Inc. | - | Yes | | No | X |
| b) | Armstrong World Industries, Inc. | - | Yes | | No | X |
| c) | Babcock & Wilcox | - | Yes | | No | X |
| d) | Combustion Engineering | - | Yes | | No | X |
| e) | Fibreboard | - | Yes | | No | X |
| f) | GAF Corporation | - | Yes | | No | X |

wise, according to defendants' theory, "the presentation may have confused the jury." As evidence that the party status distinctions on the verdict sheets *did* confuse the jury and result in "illogical" verdicts, PH points out that as a cross-claim defendant in the Hannon case (*see* footnote 1) OCF was not found liable, but was liable as a *direct* defendant in the Garrett, Scruggs, and Hohman cases.

Second, both defendants/appellants argue that the trial court also improperly combined the issues of "substantial factor causation" and "negligence" into one cross-defendant question, while asking the same two issues separately in two direct defendant questions.[8] PH contends the combination of

---

| | | | Yes | | No | |
|---|---|---|---|---|---|---|
| g) | Pittsburgh Corning Corporation | - | | | | X |

**8.** Compare the two direct defendant questions below with question 13 in footnote 7 involving only cross-defendants.

3. Do you find by a preponderance of the evidence that William E. Hohman's exposure to products manufactured, supplied, installed and/or distributed by any of the listed parties or their predecessors were a substantial factor in the development of his mesothelioma?

| | | | Yes | | No | |
|---|---|---|---|---|---|---|
| a) | Anchor Packing | - | | | | X |
| b) | Garlock | - | | | | X |
| c) | Owens–Corning Fiberglas | - | | X | | |
| d) | Owens–Illinois | - | | X | | |
| e) | Porter–Hayden | - | | X | | |

4. Has Plaintiff proven by a preponderance of the evidence that any of the listed parties or their predecessors were negligent in the manufacture, supply, installation and/or distribution of any asbestos-containing products? (Negligence.)

| | | | Yes | | No | |
|---|---|---|---|---|---|---|
| a) | Anchor Packing | - | | | | X |
| b) | Garlock | - | | | | X |
| c) | Owens–Corning Fiberglas | - | | X | | |
| d) | Owens–Illinois | - | | X | | |
| e) | Porter–Hayden | - | | X | | |

causation and negligence in one cross-defendant question "effectively eliminated the possibility of the jury answering with any specificity ... [and] created the impression that direct and cross-defendants may be treated differently."

■ The law governing "special verdicts" is found in Maryland Rule 2–522(c), which provides:

"**Special Verdict.**—The court may require a jury to return a special verdict in the form of written findings upon specific issues. For that purpose, the court may use any method of submitting the issues and requiring written findings as it deems appropriate, including the submission of written questions susceptible of brief answers or of written forms of the several special findings that might properly be made under the pleadings and evidence. The court shall instruct the jury as may be necessary to enable it to make its findings upon each issue."

Rule 2–522 gives the trial court the authority to design submissions to the jury as well as format the jury's findings. Maryland appellate courts have observed before that special verdicts are often useful in cases with multiple parties or issues. *See, e.g., Kruszewski v. Holz,* 265 Md. 434, 446, 290 A.2d 534, 541 (1972); *Sun Cab Co. v. Walston,* 15 Md.App. 113, 161, 289 A.2d 804, 829–830 (1972), *aff'd,* 267 Md. 559, 298 A.2d 391 (1973); *Food Fair Stores, Inc. v. Lascola,* 31 Md. App. 153, 161–65, 355 A.2d 757, 762–64 (1976). The defendants have presented nothing beyond conclusory allegations that the verdict sheets were prejudicial, which is certainly not sufficient for us to find that the trial judge in this case overstepped his authority in their design. We cannot accept the circular argument that the verdicts against direct defendants and for cross-defendants were "proof" of prejudice. We do not find it illogical that certain defendants were found to be directly liable in one plaintiff's case and not liable as cross-defendants in another plaintiff's case. The scenario is utterly plausible. Moreover, we simply do not grasp how combining

the issues of substantial factor causation and an ultimate finding of negligence was "confusing" to the jury or prevented them from answering with "specificity."

It appears quite plain from the jury verdicts that the plaintiffs carried their burden of persuasion as to direct defendants, but the defendants as cross-plaintiffs did not carry their burden of persuasion as to cross-defendants. Defendants may not like the outcome of the jury deliberations, but they have not demonstrated prejudice. The trial judge's refusal to grant a new trial on the cross-claims was not an abuse of discretion.

C. *Legal Sufficiency of Evidence of OI's Liability in the Hohman Case*

■ We now turn to the question of the legal sufficiency of the evidence that OI Kaylo was a substantial contributing factor in Mr. Hohman's mesothelioma.

A brief review of the facts will be helpful. In the late 1940's, OI began manufacture of Kaylo. Sometime in 1953, OI turned over the distribution responsibilities for the Kaylo line to its subsidiary OCF. In April of 1958, OI stopped manufacturing asbestos products altogether and sold its Kaylo product line to OCF.

■ William Hohman, who worked at the Conoco facility in Baltimore City from April of 1952 until his retirement in 1986, was what we have termed a "bystander," in that he did not work directly with the asbestos products but was in the vicinity of where such products were used. In order for Hohman to have a legally sufficient cause of action against OI, he must prove that OI products were a substantial causative factor in his illness and ultimate death. We stated what has come to be known as the "frequency, regularity, proximity" test for substantial factor causation in *Eagle–Picher Indus., Inc. v. Balbos:*

"Whether the exposure of any given bystander to any particular supplier's product will be legally sufficient to permit a finding of substantial-factor causation is fact specif-

ic to each case. The finding involves the interrelationship between the use of a defendant's product at the workplace and the activities of the plaintiff at the workplace. This requires an understanding of the physical characteristics of the workplace and of the relationship between the activities of the direct users of the product and the bystander plaintiff. Within that context, the factors to be evaluated include the nature of the product, the frequency of its use, the proximity, in distance and in time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff to the use of that product. 'In addition, trial courts must consider the evidence presented as to medical causation of the plaintiff's particular disease.' "

*Balbos,* 326 Md. at 210–11, 604 A.2d at 460 (citations omitted).

OI contends that plaintiffs put on no competent evidence that, during the relevant period from April, 1952, when Hohman began work at Conoco, until April, 1958, when OI sold the Kaylo line, Mr. Hohman was exposed to Kaylo to an extent that would meet our substantial factor test of causation. Thus, OI argues that the trial court erred by allowing the issue to go to the jury and not granting judgment for OI.

OI, in alleging error based on the trial court's denial of its motion for judgment, must meet a high standard. Upon a motion for judgment, "the court shall consider all evidence and inferences in the light most favorable to the party against whom the motion is made." Md. Rule 2–519(b).

Because Mr. Hohman died in 1986 of his mesothelioma, he was unable to testify. Instead, his evidence that Kaylo produced by OI was a substantial factor in his developing mesothelioma rests on the testimony of several of his co-workers at the Conoco plant; on documentary evidence that Kaylo was used at the Conoco facility during the relevant time period; and on the medical testimony of Dr. Victor Roggli.

Lloyd Urps was a union plasterer. He testified that during numerous summers during the fifties and sixties, he worked as a pipecoverer, and that "practically every summer" between 1952 and 1958 he did so at the Conoco facility where Mr.

Hohman worked. Urps further testified that he used a variety of asbestos products at the Conoco facility, including a round pipecovering asbestos product. He identified this product as manufactured by Johns–Manville, but also stated that Kaylo pipecovering was used. Finally, Urps testified that he used Kaylo asbestos block at the Conoco facility. Urps was not acquainted with Hohman and could not testify to Hohman's exposure.

William E. Whitley was an asbestos worker beginning in the 1940's and continuing until his retirement in 1982. During his career, Mr. Whitley began as an apprentice, and became a mechanic, foreman, superintendent, and manager. Mr. Whitley testified that he worked at the Conoco facility sporadically during the relevant time period (1952–1958). He identified the asbestos products in use at that time as

"[p]ipecovering products were Johns–Manville, 85 percent mag. Pipecovering and block. We used some Owens–Corning, Kaylo, pipecovering and block." [9]

Whitley, like Urps, did not know Mr. Hohman during the relevant time period, and therefore could not testify regarding Hohman's exposure to OI Kaylo.

Hohman's best evidence was provided by Otto Biden. In a twist of irony, Biden was subpoenaed to testify by OI. In Biden's own asbestos-related suit he had testified that the only asbestos product that he remembered being used at the Conoco facility was produced by Armstrong. At this trial, however, Biden also was able to recall another asbestos product, but could only remember a large "K" on the box. More importantly, Biden also placed Hohman in close proximity to asbestos dust during the relevant period:

"Q: And you were in and out of Continental Oil 20 times or more over the years?

---

**9.** OI points out that Mr. Whitley's testimony regarding the precise dates that he used Kaylo at the Conoco facility was unclear. It is clear, however, that a jury could infer that Kaylo was used during the relevant time period.

A: I probably was, yes, sir.

Q: Now, in the 1950s, did you work in the boiler house at all at Continental?

A: Yes.

. . . .

Q: In the 1950s, when you worked in the boiler house at Continental, Bill Hohman was around, wasn't he?

A: Yes.

Q: And in the 1960s, when you worked outside on the unit where all of the pipes were, Mr. Hohman was around, wasn't he?

A: Bill Hohman, William Hohman was there on every job that was even done at Continental Oil.

Q: Because that was part of his job to be there?

A: He had to give you a piece of paper to go to work.

Q: Now, when you worked in the boiler room in the '50s, was Bill Hohman around when the dust was generated from the pipecovering?

A: He had to be on every job in that boiler room."

In this way, Biden places Hohman in close proximity to the asbestos work. The testimony of Urps and Whitley, in conjunction with invoices indicating the purchase of Kaylo for the Conoco facility,[10] are further evidence from which the jury could reasonably infer that OI Kaylo was frequently and regularly used at Conoco during the relevant time period. Finally, Dr. Roggli, an expert on asbestos-related disease, testified that, in his opinion, exposure to asbestos caused Mr. Hohman to develop the mesothelioma that killed him.[11] Mr.

---

10. Dated October 27, 1954, and January 12, 1956, these invoices clearly indicate that OI Kaylo was purchased for the Conoco plant. While OI characterizes the amount purchased as "small," the jury could well infer that these were merely representative invoices.

11. OI has excerpted a small portion from Dr. Roggli's day long testimony in a futile effort to show that Dr. Roggli did not believe that OI's Kaylo was a substantial contributing factor in Mr. Hohman's injuries.

Hohman's proof of substantial factor causation is similar to that offered by Ira Russell and approved in *Godwin*, 340 Md. at 353–55, 667 A.2d at 125–26. We hold that, under the *Balbos* "frequency, regularity and proximity" test, a legally sufficient case against OI was made out in the Hohman case.[12]

D. *Uniform Contribution Among Tort–Feasors Act*

OI urges that this Court reject its long-standing interpretation of the Uniform Contribution Among Tort–Feasors [13] Act ["UCATA"], Md.Code (1957, 1994 Repl.Vol.), Art. 50, §§ 16–24, and adopt a new definition of joint tort-feasor. We decline to do so for the reasons set forth below.

The original complaint filed in the Hohman case named twenty-four (24) defendants.[14] Prior to trial, settlements were

To the contrary, Dr. Roggli's entire testimony indicated that he believed every significant exposure to asbestos (direct exposures lasting several weeks or months) is a substantial contributing factor. For example, when it was brought to Dr. Roggli's attention that Hohman may have had a significant asbestos exposure during his service in the United States Navy, Dr. Roggli agreed that that exposure would also have been a substantial contributing factor in Mr. Hohman's injuries.

**12.** OI has characterized Hohman's case as based solely on "fiber drift," a theory of causation that we rejected as too attenuated in *Balbos, supra*, 326 Md. at 216–17, 604 A.2d at 463 (1992). This is a mischaracterization of the evidence presented to the jury. There was sufficient testimony to put Hohman on the scene of heavy asbestos dust, some of which the jury could have believed to be Kaylo dust.

**13.** Another complex question presented by this case is the appropriate spelling of the word "tortfeasor." The Maryland Code uses the hyphenated form "tort-feasor," while other sources have omitted the hyphen. Out of deference to the Legislature, we shall adopt the hyphen, except where quoting from a nonhyphenating source.

**14.** Those defendants were ACandS, Inc.; Anchor Packing Co.; Armstrong World Industries, Inc.; Babcock & Wilcox Co.; The Celotex Corp.; Combustion Engineering, Inc.; Eagle–Picher Industries, Inc.; Fibreboard Corp.; GAF Corp.; Garlock, Inc.; Georgia Pacific Corp.; Keene Corp.; National Gypsum Co. (the name of this entity was changed to Asbestos Claims Management Corp. during the course of the litigation); Nicolet, Inc.; Owens–Corning Fiberglas Corp.; Owens–Illinois, Inc.; H.K. Porter Co., Inc.; Porter Hayden Co.; Pittsburgh

reached with seven of the defendants.[15] The precise terms of the settlements were sealed by the trial judge and not made a part of the record on this appeal. We have, however, exercised our discretion under Md. Rule 8–414(a) and reviewed the release agreements, in which certain sums of money were paid to Hohman's widow and to her estate in exchange for releasing these defendants from the suit. Additionally, the settlement agreements contained no admission of liability on the part of the settling defendants.

Not all of the defendants were willing to settle, however, and the case proceeded with Anchor Packing Co., Garlock, Inc., OCF, OI and PH as direct defendants.[16] To review, the remaining direct defendants, in turn, brought cross-complaints against certain settling defendants, but none of the cross-claims was successful; and neither Anchor Packing nor Garlock was found liable by the jury, leaving only OCF, OI and PH as liable defendants.

■ OI, as one of the three liable defendants, would have us offset the previously negotiated settlements against the compensatory damages awarded in the Hohman case. The theory underlying this proposal is deceptively simple. The jury valued the Hohman family's injuries at $1.5 million. If the estates of the Hohmans were allowed to keep both the $1.5 million from the jointly and severally liable defendants (OCF, OI, and PH), and the settlement payments obtained from the cross-defendants, the recovery would exceed the jury's valuation of the injuries. In OI's opinion, such a scenario is unfair

---

Corning Corp.; Quigley Co., Inc.; Raymark Industries Inc.; Southern Textile Corp.; U.S. Mineral Products Corp.; and U.S. Gypsum Co.

**15.** Babcock & Wilcox, Combustion Engineering, Armstrong World Industries, Inc., GAF Corporation, ACandS, Inc., Pittsburgh Corning Corp., and Fibreboard Corp.

**16.** Neither the plaintiff in the Hohman case nor the remaining direct defendants proceeded against certain other original defendants for a variety of reasons, including bankruptcy and lack of evidence. A list of the final direct and cross-defendants remaining in the Hohman case at the end of trial is found in footnote 5.

to the liable defendants, and the perceived unfairness could be easily rectified if only we would broaden our definition of a "joint tort-feasor" to include those sued or threatened with suit. OI could then offset the settlement amounts as contribution by the settling cross-defendants, and the Hohmans' estates would recover only the amount of money awarded by the jury.

 To accept OI's argument would require us to ignore the plain meaning of our UCATA statute and our long-standing interpretation of it, which we refuse to do. The relevant term "joint tort-feasor" is defined in Md.Code (1957, 1994 Repl.Vol.), Art. 50, § 16: "For the purposes of this subtitle ... '[j]oint tort-feasors' means two or more persons jointly or severally *liable in tort* for the same injury to person or property, whether or not judgment has been recovered against all or some of them." (Emphasis added). Moreover, "[t]he right of contribution exists among joint tort-feasors," Md.Code (1957, 1994 Repl.Vol.), Art. 50, § 17, and only among joint tort-feasors. *See Montgomery v. Valk Mfg. Co.,* 317 Md. 185, 191, 562 A.2d 1246, 1249 (1989).

 In the instant case, the cross-defendants were ultimately determined by the trier of fact *not* to be "liable in tort." Defendants judicially determined not to be liable are not joint tort-feasors. By statutory definition, then, the cross-defendants were expressly not joint tort-feasors and thus OI has no right of contribution against them.[17]

We have often recognized that a judicial determination of liability or non-liability settles the question of contribution. *See, e.g., Keene Corp. v. Levin,* 330 Md. 287, 293–94, 623 A.2d 662, 665 (1993) (final judgment may not be entered until cross-claim liability determined, because if a cross-defendant is

---

17. OI contends that holding the settling cross-defendants liable for contribution is consistent with § 885(3) and Comment *f* thereto of the *Restatement (Second) of Torts,* which permits contribution by non-tort-feasors to reduce the claim against tort-feasors. In enacting our UCATA statute, the General Assembly has explicitly rejected the common law rule set forth in the *Restatement.*

liable as a joint tort-feasor, there is a right of contribution which may reduce the amount of judgment); *Owens–Illinois v. Armstrong*, 326 Md. 107, 124–28, 604 A.2d 47, 55–57 (1992) (joint tort-feasor's release admitting liability gives right of contribution as to compensatory, but not punitive damages); *Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420, 473–75, 601 A.2d 633, 659–60 (1992) (insufficient evidence adduced at trial to hold bankrupt cross-defendant liable as a joint tort-feasor); *Valk, supra* (no right of contribution when one "joint tort-feasor" is shielded from liability as a matter of law); *Allgood v. Mueller*, 307 Md. 350, 355, 513 A.2d 915, 918 (1986) (settling co-defendants who remained in case and were found not to be liable by the jury were volunteers as to their payments to plaintiffs, and non-settling defendant who was found liable was not entitled to a reduction of the damages awarded against it); *Martinez v. Lopez*, 300 Md. 91, 476 A.2d 197 (1984) (determination of pro-rata shares); *Chilcote v. Von Der Ahe Van Lines*, 300 Md. 106, 476 A.2d 204 (1984) (computation of pro-rata shares for master and servant); *Collier v. Eagle–Picher Indus., Inc.*, 86 Md.App. 38, 585 A.2d 256 (1991) (released cross-defendants, judicially determined not to be liable, are not joint tort-feasors but mere volunteers); *C & K Lord v. Carter*, 74 Md.App. 68, 73–74, 536 A.2d 699, 701–02 (1988) (settling defendants, subsequently granted judgment, are not joint tort-feasors).[18]

### E. *Survivability of a Wrongful Death Action*

Mr. Hohman died in June of 1986. When Mr. Hohman's widow, Jeanette Hohman, instituted her suit in 1987, she did so both as the personal representative of Hohman's estate, and in her individual capacity as his widow. During the

---

**18.** The instant case thus presents the easiest possible scenario in which to determine if a defendant is a joint tort-feasor, where there is a judicial determination regarding liability. The more difficult cases are those described in *Swigert v. Welk*, 213 Md. 613, 619, 133 A.2d 428, 431 (1957), "[t]he act does not specify the test of liability. Clearly, something short of an actual judgment will suffice; we think it equally clear that a denial of liability will not."

course of the trial, Jeanette Hohman died.[19] Ms. Victoria Croghan was substituted as personal representative of the estate of William Hohman, her stepfather, and as personal representative of the estate of her mother, Jeanette Hohman. While there was no objection to the former substitution, the latter has sparked the present issue.

PH has asserted that Jeanette Hohman's wrongful death action cannot survive her death unless the substitute plaintiff is also capable of instituting a wrongful death action individually. Md.Code (1974, 1995 Repl.Vol.), § 3–904(a) of the Courts & Judicial Proceedings Article limits primary wrongful death actions to those brought "for the benefit of the wife, husband, parent, and child of the deceased person." Section 3–904(b) limits secondary beneficiaries to actions "for the benefit of any person related to the deceased person by blood or marriage who was wholly dependant upon the deceased." Because William Hohman was Victoria Croghan's step-father, not her natural father, and she was not "wholly dependant" upon him, PH argues that Croghan cannot serve as the substitute plaintiff and that, therefore, the suit must abate.

At least partially, PH's argument is based upon language from our case of *Harvey v. Baltimore & Ohio R.R. Co.*, 70 Md. 319, 17 A. 88 (1888). This interesting antique is a relic of a different era and absolutely inapplicable to the case *sub judice*. Mrs. Harvey was killed crossing a railroad track. Mr. Harvey sued for damages, but died before the suit's resolution. Our predecessors determined that in the absence of a statutory provision, Mr. Harvey's suit abated on his death. *Id.* at 325, 17 A. at 89. It is critical to our purposes to note, however, the *Harvey* Court's prefatory comment: "[t]he plaintiff [Mr. Harvey] died before the Act of 1888, ch. 262 was passed, and the question is not therefore affected by the provisions of that Act." *Id.* at 324, 17 A. at 89. The Court did

---

**19.** Mrs. Hohman's death during the course of trial is one of the bases of OCF's claim that a mistrial should have been declared. That argument is discussed *supra* at part III, section A.

not say, but a review of that Act makes clear, that had the new law been in effect at the time of Mr. Harvey's suit, the opposite result would have obtained. The new law provided that:

> "No action, hereafter brought to recover damages for injuries to the person by negligence or default, shall abate by reason of the death of the plaintiff, but the personal representatives of the deceased may be substituted as plaintiff and prosecute the suit [to] final judgment and satisfaction."

Chapter 262 of the acts of 1888. This new survival statute supplemented the previously existing law, which permitted a variety of actions to survive the death of the plaintiff. Md. Code (1860), Art. 2, § 1 ("ejectment, waste, partition, dower, replevin, or any personal action, including appeals from judgments rendered by justices of the peace ...").

The subsequent history of ch. 262 is easy to trace. It was originally codified at Art. 75, § 33A, but immediately recodified at Md.Code (1888), Art. 75, § 25. It continued as Md. Code (1904), Art. 75, § 26, Md.Code (1911), Art. 75, § 26, Md.Code (1924), Art. 75, § 30, Md.Code (1939), Art. 75, § 30, and Md.Code (1951), Art. 75, § 30. The comprehensive code revision of 1957 apparently failed to continue the provision and it was "lost" until six years later. In 1963, a corrective bill returned the provision to the statute books as Md.Code (1957, 1963 Cum.Supp.), Art. 75, § 15B.[20] In 1973, as part of the overall code revision process, this section was recodified as Md.Code (1974), § 6–401 of the Courts & Judicial Proceedings Article:

**"Sec. 6–401. Survival of Actions.**

*(A) At law.*—A cause of action at law, whether real, personal, or mixed, except slander, survives the death of either party.

---

20. The new enactment varied from its predecessor only slightly in that it deleted two extraneous commas, deleted the word "hereafter," and added a sentence concerning the retroactive application of the provision.

*(B) In equity.*—A right of action in equity survives the death of either party if the court can grant effective relief in spite of the death."

The revisor's note makes clear that § 6–401(a) is intended merely to combine two previous code sections but not to change the types of actions permitted to survive the death of a party. *See* chapter 2, § 2 of the acts of 1973, 1st Sp. Sess. For the purposes of this case, the statute remains unchanged.[21]

 The plain language of § 6–401 indicates that a wrongful death action, as a personal action at law, may survive the death of either party. A similar result would obtain under chapter 242 of the acts of 1888 as applicable immediately after the *Harvey* decision, because a wrongful death action is one "to recover damages to the person by negligence."

Although the plain language of the statute is controlling, it is useful to confirm that understanding with a look at the statutory scheme and the public policy that animates it. PH argues that permitting survival of a cause of action instituted by a primary beneficiary would displace the secondary beneficiaries. This analysis is incorrect. Instead, in applying the wrongful death statute, we must ask if a statutorily defined primary beneficiary survived the decedent and could file suit. If that primary beneficiary survives to file suit, then that beneficiary, or the beneficiary's successor, can recover. If there are no living primary beneficiaries to file suit, then a secondary beneficiary may file suit. The secondary beneficiary, or in the event of the secondary beneficiary's death after institution, but prior to conclusion, of the suit, the successor to the secondary beneficiary, may continue the suit to judgment. If there are neither primary nor secondary beneficiaries living to file suit, no one may recover for the decedent's wrongful death. Victoria Croghan was the primary beneficiary's suc-

---

**21.** Chapter 359 of the acts of 1988 added a new subsection (b) making clear that actions in slander do not survive the death of the plaintiff. The former subsection (b) was renumbered as subsection (c).

cessor and as such can recover on behalf of Mrs. Hohman's estate.

The result we must reach is also consistent with the purpose underlying the wrongful death statute. PH's acts deprived Mrs. Hohman of her husband's economic and emotional support for the last eight years of her life.[22] This deprivation was not abated by her death. Her estate may be smaller now than it would have been had her husband survived. Therefore it was perfectly appropriate for the trial judge to substitute Victoria Croghan as the personal representative of the estate of her mother, Jeanette Hohman, in her wrongful death suit against PH.[23]

### F. *Punitive Damages Award Against OCF*

Only one of the defendants, OCF, was found liable by the jury for punitive damages, in the case of Mr. Scruggs and his exposure to OCF Kaylo during the years 1968–1972. OCF argues strenuously that plaintiffs failed to meet their burden of proof for punitive damages of actual malice, as required by *Owens–Illinois, Inc. v. Zenobia, supra,* 325 Md. 420, 601 A.2d 633, a strict products liability action involving asbestos exposure. We agree. We review the applicable law and apply it to the evidence presented to the jury in the instant case.

The purpose of punitive damages is not only to punish the defendant for egregiously bad conduct toward the plaintiff, but also to deter the defendant and others contemplating

---

22. The jury clearly agreed, awarding Victoria Croghan, as personal representative of her mother's estate, $250,000 for loss of consortium and $250,000 for wrongful death.

23. Porter Hayden's reliance on our opinion in *Stewart v. United Elec. Light & Power,* 104 Md. 332, 65 A. 49 (1906), is misplaced. This case stands for the proposition that survival actions are separate and distinct from wrongful death actions. This distinction continues to exist in this case, allowing Ms. Hohman to bring suit both as the personal representative of William Hohman's estate *and* in her individual capacity in a wrongful death action. The *Stewart* decision merely clarifies that both of these actions are viable and that recovery may be had on both. It says nothing about the subsequent survivability of the wrongful death action.

similar behavior. Our most recent reiteration of these twin purposes in an asbestos products liability case was in *ACandS, Inc. v. Godwin, supra,* 340 Md. 334 at 361–62, 667 A.2d at 129 (citing *Zenobia,* 325 Md. at 454, 601 A.2d at 649–50; *Schaefer v. Miller,* 322 Md. 297, 321, 587 A.2d 491, 503 (1991), *Embrey v. Holly,* 293 Md. 128, 142, 442 A.2d 966, 973 (1982); *First Nat'l Bank v. Fidelity & Deposit Co.,* 283 Md. 228, 232, 389 A.2d 359, 361 (1978)).

As we discussed in both *Zenobia* and *Godwin,* however, the imposition of serious monetary liability for egregious conduct can only work as a deterrent to future conduct if the standard by which conduct will be judged is clear, predictable and consistent and persons can thus conform their behavior to avoid punitive liability. *Godwin,* 340 Md. at 362, 667 A.2d at 129 (citing *Zenobia,* 325 Md. at 455, 601 A.2d at 650). Therefore, we established a test for awarding punitive damages in *Zenobia,* reiterated in *Godwin,* in which we made clear that a plaintiff must prove actual malice, not simply implied malice, to recover punitive damages in a non-intentional tort action. *Zenobia,* 325 Md. at 460, 601 A.2d at 652; *Godwin,* 340 Md. at 358, 667 A.2d at 127. We defined the term "actual malice" as "conduct characterized by evil motive intent to injure, ill will, or fraud." *Godwin,* 340 Md. at 359, 667 A.2d at 127–28; *Zenobia,* 325 Md. at 460 n. 20, 601 A.2d at 652 n. 20.

In products liability cases, however, we have recognized that such evil motive or ill will directed at the injured consumer by the manufacturer is unlikely. Therefore, we constructed a two-part test for actual malice in *Zenobia,* applied in *Godwin* as well, which still considers the intentions and state of mind of the defendant manufacturer but which can be readily applied in products liability cases where the actual contact between plaintiff and defendant is attenuated:

> "*Zenobia* recognized the inherent difficulty in translating the aforementioned definition of 'actual malice' to products liability cases. We noted that 'it is not likely that a manu-facturer or supplier of a defective product would specifically intend to harm a particular consumer.' Consequently, '*in products liability cases the equivalent of the "evil motive,"*

*"intent to defraud," or "intent to injure," which generally characterizes "actual malice," is [1] actual knowledge of the defect and [2] deliberate disregard of the consequences.'* This two-part standard looks to the state of mind of the defendant."

*Godwin,* 340 Md. at 359, 667 A.2d at 128 (emphasis added) (citations omitted).

 To meet the knowledge requirement of the *Zenobia* test for actual malice, a plaintiff must show more than constructive knowledge: "[t]he plaintiff must show that the defendant *actually* knew of the defect and of the danger of the product at the time the product left the defendant's possession or control." *Zenobia,* 325 Md. at 462, 601 A.2d at 653–54 (emphasis in original). Demonstrating a "willful refusal to know" will also be sufficient to pass the first step of the test for actual malice, if the plaintiff can show that the defendant " 'believes that it is probable that something is a fact, but deliberately shuts his or her eyes or avoids making reasonable inquiry with a conscious purpose to avoid learning the truth.' " *Godwin,* 340 Md. at 360, 667 A.2d at 128 (quoting *State v. McCallum,* 321 Md. 451, 458, 583 A.2d 250, 253 (1991) (Chasanow, J. concurring)).

 Under *Zenobia* and *Godwin,* the plaintiff who successfully shows actual knowledge of the defendant, thereby passing part one of the *Zenobia* test, must then demonstrate the defendant's bad faith in order to meet the second requirement:

"Additionally, a products liability plaintiff must show that the defendant, having such actual knowledge, exhibited a conscious or deliberate disregard of the potential harm to consumers. *Zenobia,* 325 Md. at 463, 601 A.2d at 654. Under *Zenobia* it is clear that 'negligence alone, no matter how gross, wanton, or outrageous, will not satisfy this standard. Instead *the test requires a bad faith decision by the defendant to market a product, knowing of the defect*

*and danger, in conscious or deliberate disregard of the threat to the safety of the consumer.' Id."*

*Godwin,* 340 Md. at 360–61, 667 A.2d at 128 (emphasis added).

Moreover, under *Zenobia* plaintiffs in any tort case seeking punitive damages must prove knowledge and bad faith by a standard of "clear and convincing evidence" rather than the preponderance standard used to prove liability for compensatory damages. *Zenobia,* 325 Md. at 469, 601 A.2d at 657. We reasoned in *Zenobia* that the heightened standard of proof was appropriate because not only money but stigmatization was at stake in an award of punitive damages:

"Use of a clear and convincing standard of proof will help to insure that punitive damages are properly awarded. We hold that this heightened standard is appropriate in the assessment of punitive damages because of their penal nature and potential for debilitating harm. Consequently, in *any* tort case a plaintiff must establish by clear and convincing evidence the basis for an award of punitive damages."

*Zenobia,* 325 Md. at 469, 601 A.2d at 657 (emphasis in original).

We now turn to the instant case and apply the *Zenobia* test to OCF"s actions in manufacturing and marketing Kaylo during the time Mr. Scruggs was exposed. In determining whether the plaintiffs failed to meet their burden of proof on punitive damages, we are *not* considering the weight of the evidence presented by the plaintiffs, as that is solely a jury question; rather, we pass upon the sufficiency of the evidence to take a case to the jury at all. *See Benkoe v. Plastic Assembled Prod., Inc.,* 231 Md. 419, 420, 190 A.2d 638, 639 (1963); *May v. Warnick,* 227 Md. 77, 88, 175 A.2d 413, 419 (1961); *Boob v. Fisher,* 225 Md. 278, 281, 170 A.2d 298, 299 (1961). Therefore, in this case we shall have to find that the evidence was insufficient as a matter of law for a reasonable jury to have found *by a clear and convincing standard* that OCF had actual knowledge of the dangers of Kaylo, and that

OCF made a bad faith decision to market Kaylo despite its knowledge of the threat to the consumer.

As we discussed at length in *Godwin* the general state of the art knowledge up to 1972 concerning asbestos and its effects, 340 Md. at 363–67, 667 A.2d at 129–32, we shall not repeat it here, except where relevant to OCF's particular arguments.

1. *Conflicting Interpretations of OCF's Knowledge of Asbestos Hazards and Kaylo Hazards*

OCF argues, in effect, two separate theories as to why it did not have the requisite actual knowledge of Kaylo's hazards. First, OCF contends that at the time Mr. Scruggs was exposed, OCF did *not* believe Kaylo was a dangerous or defective product because it "believed or hoped" that Kaylo's unique manufacturing process eliminated the health risk of the asbestos component of Kaylo. Internal OCF documents from the mid–1960's, contained in the voluminous record in this case and presented to the jury, add support to OCF's contentions. While the company officials were aware of the potential dangers of asbestos if mishandled, they were not convinced that Kaylo, which contained only 15% asbestos and which was produced through a heat-intensive chemical alteration process, carried the same risks. One writer of a 1964 OCF memorandum commented on Dr. Selikoff's study, *supra,* n. 2, noting that asbestos was altered chemically and physically "during the autoclaving process in the presence of lime" and then stating "[w]hether or not this altered asbestos possesses the same cancer inducing tendencies as the original asbestos remains to be demonstrated." Almost three years later, the very same individual repeated his questions in an internal memorandum reviewing the latest studies confirming asbestos carcinogenicity, asking, "[D]oes any, or could any, of the organic carcinogenic oils [24] remain in the asbestos fraction of

---

**24.** Certain internal OCF memoranda advance a theory prevalent during the 1960's that it was not the asbestos fibers themselves but certain organic oils found in asbestos and the other materials which made up

Kaylo after having been subjected to the severe conditions of the autoclave? Would there be chemical alteration in the presence of lime?" The writer also questioned again the applicability of the Selikoff study done three years earlier to Kaylo and other calcium silicate insulations, and concluded:

"Thus Kaylo insulation is indicted only by inference and association, and not by direct evidence. The only common denominator is that asbestos is a component of thermal insulation in general. The possibility that the carcinogenic property or contaminant of asbestos may be eliminated during calcium silicate processing should not be ignored or dismissed from consideration."

OCF's second line of attack is based on the widely prevailing view during the relevant time period of 1968 to 1972 that asbestos dust was not hazardous to a worker's health until it reached a certain concentration, called a "threshold limit value," in the work environment air. The "threshold limit value" was a term used to describe the average concentration of dust particles (of all kinds, not merely asbestos) per cubic foot of air to which an individual in a work environment where asbestos dust was created could, at least in the consideration of the health experts of the day, be "safely" exposed.[25] OCF argues that at the time of Mr. Scruggs' exposure, company officials believed that even if asbestos' dangerous properties were not diminished or eliminated in the Kaylo manufacturing

_____

Kaylo which were carcinogenic to asbestos trade workers; the theory was of course welcome to OCF officials, who hypothesized in these documents that the pressurized heat of the autoclave would destroy anything organic in Kaylo.

**25.** The "value" for asbestos was determined at that time to be five million particles of dust per cubic foot of air by the American Conference of Governmental Industrial Hygienists (ACGIH), a loose network of governmental health officials from around the country; in any case, after 1972, the federal government promulgated mandatory safety standards based on an average number of airborne asbestos fibers rather than on the threshold limit value. By that time, OCF was producing asbestos-free Kaylo. A more complete discussion of the historical development of safety standards for asbestos is found in *Godwin, supra,* at 365–67, 130–31.

process, the small amount of asbestos in Kaylo would not create a concentration of dust particles exceeding the threshold limit value for asbestos.

The same writer commenting on the Selikoff studies noted rather tentatively in another memorandum in 1964 that the dust content in areas where workers used Kaylo could "be expected normally to be below the threshold limit value," because "good housekeeping and efficient working conditions dictate the use of dust collectors over saws and sanding machines in any case. . . ."

OCF also cites to studies it had done in the early 1960's on the dangers of fabricating Kaylo and other thermal insulations, in which the industrial hygienist who conducted the studies, Robert Peele, found that "the fabrication of Kaylo insulation with band saws does not constitute a hazard to health." In a follow-up study several months later, Mr. Peele and his investigators performed three separate intervals of dust sampling, analysis, and evaluation in the Construction Insulation Shop at a Union Carbide plant to resolve "unanswered health problems." Mr. Peele did not include Kaylo in the third of the three intervals of sampling because the first investigation, without any supplementary ventilation, disclosed only one exposure exceeding the threshold limit value and "therefore, it could be assumed that any ventilation that might be added could be more than adequate in controlling the hazard."

OCF's belief, during the time period of concern in this case, in a "safe" level of asbestos dust was entirely consistent with the prevailing view among industrial hygienists that "asbestos-caused diseases, principally asbestosis, could be generally avoided if dust in the work environment could be kept below a certain limit. . . ." *Godwin*, 340 Md. at 365, 667 A.2d at 130. As we described in *Godwin*, the U.S. Secretary of Labor publicly acknowledged the controversy over the toxicity of asbestos and "the determination of a specific level below which exposure is safe." *Id.* at 366, 667 A.2d at 131. Further evidence that experts in the 1960's widely accepted the theory

of a safe level of asbestos dust comes from the record in this case. In 1968, the New York Academy of Sciences sponsored a meeting of industrial hygienists chaired by Dr. Irving Selikoff, author of the famous 1964 study linking asbestos and cancer, *supra*, n. 2. Dr. Selikoff himself, possibly the leading medical authority on the hazards of exposure to asbestos, expressed his view at this meeting that improved working conditions and reduced dust could reduce the health hazards of asbestos. According to the staff person at OCF who attended the meeting, J.L. Konsen, M.D., Dr. Selikoff "proposed an ambitious program of research to develop practical engineering methods to lower the atmospheric dust level on construction jobs with primary emphasis on the insulation workers." Several months earlier, in a speech to the International Association of Heat and Frost Insulators and Asbestos Workers at its annual convention, Dr. Selikoff discussed at length the methods by which asbestos workers and insulators could protect themselves from asbestosis:

> "Well, this is a hazard you people face, and a hazard I hope we are going to be able to clear up. There is no reason under the sun that this can't be cleared up, none, because it depends upon how much dust, in large part,—there are individual reactions, not everybody reacts to the dust the same way; there are individual idiosyncrasies, but, basically, it is due to how much dust you fellows breathe in. And if we can't make the trade safer, we are crazy. If we can't keep dust out of the air, we don't deserve to call ourselves the proud United States of America."

The plaintiffs/appellees in the instant case contend that the very same documents in the record relied upon by OCF to show lack of knowledge clearly indicate OCF's full knowledge of the available state of the art research concerning asbestos and asbestos products and their potentially harmful effects. Dr. Selikoff's study was published and OCF was aware of it three years before Mr. Scruggs began work with Kaylo. The record also reflects that OCF officials were aware of and intensely interested in other research on the carcinogenicity of asbestos being conducted at Fairleigh Dickinson University in

New Jersey, in Africa, and around the world, before Mr. Scruggs' employ. In addition, for at least two decades before 1968, senior officials at OCF knew of the voluminous medical evidence concerning asbestosis, a severe and deadly lung disease caused by inhalation of asbestos fibers. It seems incontrovertible that key executive and medical personnel at OCF had read or been apprised of numerous studies showing that asbestos trade workers had an elevated risk of mesothelioma, among other diseases.

2. *Conflicting Interpretations of OCF's Cautionary Labels on Kaylo and OCF's Search for An Asbestos–Free Kaylo*

We are also presented with reasonable but conflicting interpretations of other OCF actions preceding and during Mr. Scruggs' exposure. For example, OCF's knowledge of some level of hazard could be inferred from its decision to label all Kaylo packages advising users of potential hazards and advising safe handling precautions. The record, consisting of internal memoranda, orders to and invoices from packaging companies, and photographs of the Kaylo boxes, reflects that after December 1966 boxes of Kaylo were marked:

"THIS PRODUCT CONTAINS ASBESTOS FIBER—If Dust Is Created When This Product Is Handled, Avoid Breathing The Dust—If Adequate Ventilation Control Is Not Possible, Wear Respirator Approved By U.S. Bureau Of Mines."

The label was changed in 1970 to be more specific regarding the harm possibly caused by breathing Kaylo dust:

"CAUTION—PRODUCT CONTAINS ASBESTOS FIBER—Inhalation Of Dust In Excessive Quantities Over Long Periods Of Time May Be Harmful. Avoid Breathing Dust. If Adequate Ventilation Is Not Possible, Wear Respirators Approved By The U.S. Bureau Of Mines For Pneumoconiosis Producing Dust."

On the other hand, the labels on the Kaylo packages recommended safe handling practices, an indication that OCF be-

lieved Kaylo *could* be safely handled. Such a belief would have been consistent at the time with the state of the art knowledge, as discussed, *supra*, and in *Godwin*, that asbestos was only dangerous when its threshold limit value was exceeded due to poor handling practices and inadequate ventilation. In fact, at the time OCF began to label its Kaylo packages in December of 1966, the federal government had neither adopted safety standards nor promulgated any labeling regulations for asbestos products. It was not until 1972, six years later, that an Occupational Safety and Health Act (OSHA) regulation required a cautionary label on asbestos products [26]; by that time, OCF was six months away from producing asbestos-free Kaylo. OCF also argues that its actions in labeling its cartons years before the government required such labels demonstrated its commitment to protecting the workers who used Kaylo, and therefore negates as a matter of law any charge of bad faith in marketing Kaylo.[27]

The testimony and exhibits in the case showed that OCF embarked on an extensive research project in the mid–1960's to discover a replacement for asbestos in Kaylo which would serve the same reinforcement and bonding purposes, a project which plaintiffs claim may have indicated OCF's awareness that any asbestos at all was soon to be no longer an acceptable health risk to workers. The evidence of a search for a replacement bonding agent could appear inconsistent with OCF's claim that it "believed or hoped" asbestos Kaylo was not dangerous.

The search for a replacement bonding agent for asbestos, however, while conceivably inconsistent with a claim that asbestos in Kaylo was not dangerous, is also inconsistent with

---

**26.** 37 Fed.Reg. 11318, 11321 (1972). *See Godwin*, 340 Md. at 365–66, 667 A.2d at 131 for an in-depth history of the labeling regulation.

**27.** We emphatically do not agree with OCF's premise that any warning label at all negates bad faith "as a matter of law." A warning label could be affirmatively misleading or so grossly inaccurate or inadequate to cross the line from gross negligence to "intent to defraud." The question is not whether a warning label of any content existed, but what the content of the label was.

the plaintiffs' claim that OCF was proceeding to manufacture and market Kaylo in deliberate disregard of safety concerns. The minutes, memoranda, and reports contained in the record which detail the search for an effective asbestos-free Kaylo design refer repeatedly to the "potential" health hazard presented by asbestos in Kaylo and the "urgency motive" to find a replacement. This evidence clearly demonstrates, according to OCF, that the company was concerned about its consumers and actively invested money and sought solutions to the possible health hazards of Kaylo.

### 3. *Other Evidence of Bad Faith*

Plaintiffs/appellees seek to strengthen their argument that OCF acted in bad faith by introducing at trial documents and testimony detailing OCF's fiscal, marketing and public relations concerns over asbestos Kaylo. For example, plaintiffs cite the trial testimony of Jerry Helser, the quality control supervisor at the Kaylo plant, concerning the excessive costs of spraying asbestos with a sealant which would significantly reduce dust:

"Q. Mr. Helser, let me show you a statement by Mr. Gould, the attorney that you met with . . . and ask you to read along with me. I'm going to ask you if this refreshes your recollection. It says Jerry does recall that there were experiments run to reduce surface dust on Kaylo. He recalls that they were very successful when Kaylo was sprayed with sodium silicate. However, it is also Jerry's recollection that this type of Kaylo product was not marketed because of the cost involved in spraying the product. Do you see that, sir?

A. Yes, sir.

Q. Is that your recollection, that the sodium silicate was not used because of the cost involved in spraying the product?

A. Cost because we couldn't spray it properly.

Q. You couldn't spray it properly onto the product?

A. That's right. We had a terrible time trying to spray that type of material."

Apparently this and other such evidence was supposed to demonstrate to the jury OCF''s misplaced priorities and bad faith at a time when it had actual knowledge of the dangerous properties of Kaylo.

Similar claims were made in *Godwin* against more than one defendant; we state here as we implied then that evidence that a company is considering cost and negative publicity implications of a problem product does not alone constitute evidence of bad faith in marketing the product. Normally, such corporate activities would hardly be evidence of "evil motive" or "intent to defraud" as required to show "actual malice." In fact, one would expect the OCF marketing department to have practical concerns about public relations concerning Kaylo, and its accountants and quality control supervisors to run cost-benefit analyses on potential solutions. Yet, plaintiffs/appellees argue here that the company's focus on costs and public relations was not normal, but rather demonstrated the company's affirmative attempts to deceive Kaylo consumers and the public and was evidence of "a bunker mentality."

The only rational way to interpret plaintiffs/appellees' argument is to recognize its fundamental premise: that OCF acted in bad faith because it did not remove Kaylo from the market instantly and completely in the mid–1960's. Absolutely nothing in the record or in the state of the art medical or industrial knowledge of the time supports such a premise. No one in 1968, not even the medical experts who were researching and discovering the links between asbestos and cancer, believed, or at least voiced any belief, that asbestos needed to be immediately eliminated entirely. While in hindsight taking Kaylo off the market in the mid–1960's may have been prudent, in no way does OCF's failure to take Kaylo immediately off the market at that time connote bad faith sufficient to support a punitive damages verdict.

The plaintiffs/appellees also point out that the very fact that the jury awarded punitive damages only in the case of Mr. Scruggs and not in either Mr. Hohman's or Mr. Garrett's case is telling evidence that the jury understood and applied the stringent proof of bad faith required for punitive damages. They argue that the jury must have determined that OCF's decision to market Kaylo in the late 1960's and early 1970's, long after the dangers of asbestos were well-known, was more egregious and worthy of punishment than OCF's marketing of the product in the 1950's, when both Mr. Garrett and Mr. Hohman were exposed. While the argument is clever and has some merit, the question before us is not whether the jury understood the task at hand, but whether the evidence was legally sufficient for a reasonable jury to find, by a clear and convincing standard, that OCF acted with actual malice in marketing Kaylo.

4. *Conclusion: Evidence of Actual Knowledge and Bad Faith Not Legally Sufficient to Meet Clear and Convincing Evidentiary Standard*

As we noted in *Godwin* when discussing the evidence against defendant Pittsburgh Corning Corporation, the proof before us "cuts both ways." *Godwin,* 340 Md. at 378, 667 A.2d at 137. Evidence of OCF's awareness of state of the art medical knowledge about asbestos includes evidence of OCF's general agreement with the state of the art knowledge that controlled and limited asbestos exposure could be safe. Evidence that OCF was concerned enough about asbestos hazards to label its Kaylo packages also demonstrates that OCF believed safe handling of asbestos would eliminate health hazards, and that OCF intended to make workers aware of the risks of Kaylo when improperly handled.[28] Evidence that

---

28. We note that plaintiffs produced testimony at trial and in oral argument to us that Mr. Scruggs and Mr. Garrett never saw such warnings, and further that the evidence that such warnings existed at all was underwhelming. While it is not our task to weigh evidence, we do point out from our review of the record that, to the contrary, OCF produced voluminous and persuasive evidence of labeling. Photo-

OCF was actively working to preserve its market share of thermal insulation by designing an asbestos-free Kaylo provides evidence that OCF was worried about the health hazards asbestos presented and affirmatively sought to protect its users.

Clear and convincing evidence of bad faith to support a punitive damages award "goes far beyond that required to support a compensatory damages award based on the underlying strict liability claim ... [and] in a products liability action based on negligence requires the plaintiff to prove much more than negligence." *Zenobia,* 325 Md. at 465, 601 A.2d at 655. If we substitute the words "OCF" and "Kaylo" for "PCC" and "Unibestos," the following quotation from *Godwin* exactly describes the state of the evidence in the instant case:

"At all relevant times the widespread belief was that the extent of the health risk depended, in large part, on the length and intensity of exposure.... It may be that a jury would believe that the corporate decision to adopt health warnings came too late and, even then, that it was motivated only by the desire to minimize tort liability. It may also be that a jury would believe that PCC [OCF] was not only negligent in these respects, but that it was grossly negligent. *These possible inferences or conclusions, however, do not demonstrate that PCC [OCF] made a bad faith decision to market Unibestos [Kaylo] in conscious or deliberate disregard of the threat to the safety of the consumer. Plaintiffs have not shown by clear and convincing evidence that ... PCC [OCF] did not in good faith believe that its recommendations for exhaust ventilation, ... housekeep-*

---

graphs clearly show that the label was on the top of the box facing the individual opening the box. Although small (2 in. by 3 and 1/2 in.), it was bordered and printed in red and used capital letters. Invoices from the boxing companies demonstrated that all packaging for Kaylo contained the labels; other photographs of workers showed discarded marked Kaylo boxes right next to the workers. A co-worker of Mr. Scruggs testified that he knew Kaylo had asbestos in it because of the word "asbestos" on the box, yet from our review of the photographs and packaging invoices the word "asbestos" only appeared on the box within the cautionary label.

*ing, and use of respirators were reasonable protections for users."*

*Godwin,* 340 Md. at 378–79, 667 A.2d at 137 (emphasis added).

Mr. Scruggs was an insulator for two months, and a bystander who regularly inhaled asbestos fibers for four years, the last four years OCF produced asbestos Kaylo. His exposure to asbestos killed him, and the jury found that OCF and PH were both negligent and strictly liable for his death. Certainly the jury had sufficient evidence to find both that the companies knew that Kaylo and other asbestos products posed a potential danger, and that the warnings given to Mr. Scruggs were negligently inadequate. On the record before us, however, we cannot say that the evidence of actual malice was legally sufficient under a clear and convincing evidentiary standard to submit the question of punitive damages to the jury. We reverse the award of punitive damages against OCF in the case of Mr. Scruggs.

## G. *Remaining Issues*

OCF makes three other arguments concerning the punitive damages award against it in the case of Mr. Scruggs. First, OCF claims that the trial judge's jury instructions on punitive damages were improper because they were not consistent with *Zenobia.* OCF also argues that the trial judge violated OCF"s due process rights when it failed to conduct a post-verdict review of OCF"s liability for punitive damages. Finally, OCF contends that the evidence that the twin goals of punishment and deterrence were furthered by a punitive damages award against OCF was legally insufficient. We shall not consider any of these arguments, as their resolution is not necessary to our decision today.

*JUDGMENT FOR PUNITIVE DAMAGES AGAINST APPELLANT OWENS–CORNING FIBERGLAS CORPORATION REVERSED; ALL OTHER JUDGMENTS AFFIRMED. COSTS TO BE DIVIDED, ONE–FIFTH (1/5) TO BE PAID BY LENORA SCRUGGS INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF HARVEY*

*SCRUGGS, DECEASED, AND FOUR–FIFTHS (4/5) TO BE PAID BY APPELLANTS.*

Concurring and dissenting opinion by BELL, J., in which CHASANOW and RACKER, JJ., Join.

BELL, Judge, concurring and dissenting.

I have no quarrel with any of the substantive conclusions of the majority opinion except the one reached in Part III.F., pertaining to the punitive damages award against Owens–Corning Fiberglas Corporation ("OCF").4 With respect to Part III. F., I am firmly of the view that there was ample evidence presented to the jury to justify its verdict awarding punitive damages against OCF and in favor of appellee Scruggs. Accordingly, I dissent from that part of the opinion and judgment.

In a products liability case, an award of punitive damages may be sustained only if the evidence adduced by the plaintiff establishes "the equivalent of the 'evil motive,' 'intent to defraud,' or 'intent to injure,' which generally characterizes 'actual malice,' [i.e.] actual knowledge of the defect and deliberate disregard of the consequences." *Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 462, 601 A.2d 633, 653 (1992).[1] The actual knowledge component of the test is satisfied where there is, on the part of the defendant, a "willful failure to know," that is, where the defendant "believes that it is probable that something is a fact, but deliberately shuts his or her eyes or avoids making reasonable inquiry with a conscious purpose to avoid learning the truth." *State v. McCallum,* 321 Md. 451, 458, 583 A.2d 250, 253 (1991) (Chasanow, J. concurring). Thus, in order for the plaintiff to prevail on the issue of punitive damages, the plaintiff must establish that the defendant, having the requisite knowledge, nevertheless, acted in

---

1. I dissented from this formulation of the test for punitive damages, believing that the system was not broke and, therefore, was not in need of fixing. *See Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 478–86, 601 A.2d 633, 661–65 (1992) (Bell, J. concurring and dissenting).

bad faith in distributing its product. *ACandS v. Godwin,* 340 Md. 334, 358–9, 667 A.2d 116, 128 (1995).

Whether the defendant had the requisite knowledge and acted in bad faith are questions of fact to be determined by the trier of fact, in this case, the jury. Such matters are not matters of law reserved for the trial court and, thus, most assuredly, are not matters to be resolved by an appellate court. Moreover, those facts need not be established by direct evidence. Because a party's state of mind is peculiarly within the power of that party to disclose, or not, as he or she chooses, the other party cannot prove that party's knowledge or bad faith except by circumstantial evidence. Certainly, the party whose actions are under scrutiny cannot, and should not, be permitted, by requiring that the proof be by direct evidence, to determine the outcome of the inquiry. The issue for our determination then is whether the evidence the appellee Scruggs adduced as to OCF's state of mind and knowledge was sufficient to sustain the jury's award of punitive damages. As to that issue, the jury had before it the following evidence in addition to that set out in the majority opinion. *See* 343 Md. 500, 541–549, 682 A.2d 1143, 1163–1167 (1996).

The appellee Scruggs, an insulator for a time, as to whom the hazard from exposure was greatest, and a by-stander thereafter, first was exposed to asbestos in 1968. By that time, OCF was well aware of the dangers associated with asbestos. It had known, by that time for more than two decades, that dust containing asbestos should not be breathed and that if it were, it represented a real danger because it was a carcinogen.

OCF had knowledge, through its parent companies, that asbestos was dangerous as early as 1938. In that year, one of its parent companies, Owens–Illinois, was informed, by letter from a Doctor from the Saranac Laboratory that asbestos "is known to produce fibrosis of the lungs [and] also cause[s] fibrosis in other tissues when injected in sufficient quantities." The year before, the other parent, Corning Glass Works, quoted the same Doctor's work to the same effect. That OCF

had direct knowledge of the hazardous nature of asbestos was evident in 1941, when one of the lawyers in its Legal and Patent Department, having received a letter from a Saranac Doctor, expressed his gratification at the Doctor's belief, referring to OCF's main product at the time, fiberglas, that "we are not going to encounter any evidence of an asbestos-like reaction because none of the fiber reaches the lungs." Moreover, OCF has admitted that, in that same year, it was aware of a case of asbestosis or cancer in a user of an insulation product which contained asbestos.

Thereafter, OCF developed a "germ of a major strategy." It was to put together an asbestos file to be held as a "weapon in reserve." The file would be "an impressive file of photostats of medical literature on asbestos," to comprise some 500–600 pages, including "two bibliographies covering medical literature to 1938, citing references to scores of publications in which the lung and skin hazards of asbestos are discussed." The file was to be used should the unions balk at working with fiberglas or should they require OCF to pay a premium for doing so. It compiled the file, although it never had to resort to its use. Thus, it is clear that, by 1942, more than 10 years before it began to market a product containing asbestos, OCF had a wealth of knowledge concerning the hazards of asbestos and that the knowledge it had was actual and not constructive.

Despite having this knowledge and being concerned with avoiding having its fiberglas product "smear[ed] with the hazards of asbestos," OCF began mixing fiberglas and asbestos, which it sold as Kaylo, in 1953. When OCF was reminded, in 1956, by a Doctor from whom an opinion was solicited concerning favorable past experiments with fiberglas, that "asbestos is fairly incriminated as a carcinogen and the asbestos causes damage by virtue of the length of its fibers," the concern it expressed was about the "general tenor" of the letter containing the reminder and the fact that "[i]t is certainly nothing that we could show customers or a union." A similar concern was expressed in response to Dr. Selikoff's 1964 study of insulation workers. In a confidential memorandum, OCF's Director of Industrial & Personnel Relations,

wrote: "our present concern is to find some way of preventing Dr. Selikoff from creating problems and affecting sales." Indeed, it appears that the purpose for which OCF monitored the medical experiments and studies was to keep tabs on how the public perceived its product and to gauge the effect of the experiments and studies on the profitability of the product.

OCF was aware that asbestos was more dangerous to the insulation worker because that worker handled it directly and, therefore, was exposed to a greater extent than a by-stander. And it knew that it was the dust generated during the insulation process that posed the danger. The September 17, 1963 memorandum by William Lotz of OCF"s Product Development Laboratory is illustrative. He wrote: "Asbestos (as found in Kaylo) when breathed into the lungs causes asbestosis which often leads to lung cancer.... All insulations are dusty and insulators seldom complain except when the dust is particularly irritating to them."

There was a view between 1968 and 1972 that asbestos dust was hazardous only above a certain level of concentration. The indicator of the average concentration of dust particles per cubic foot of air to which a worker could be exposed safely was characterized by a threshold limit value. The evidence before the jury was that OCF did not accept as gospel the accuracy of that value. In a 1966 memorandum, the Director of Industrial and Personnel Relations wrote:

Asbestos is recognized as a health hazard causing asbestosis. Asbestosis requires 12 years or more of exposure to cause objective symptoms. The threshold limit value set by the A.C.G.I.H. is 5 million particles per cubic foot. However, Dr. Selikoff has stated that only one fiber in the body can cause cancer ...

Asbestos bodies sometimes develop into mesotheliomas, a tumor with considerable carcinogenic potential.

Because of asbestosis (if for no other reason), asbestos fibers should be removed from the atmosphere by adequate ventilation. If ventilation is impossible, suitable respirators

should be worn by workmen. At this point, I believe there is reason to question the A.C.G.I.H. threshold limit.... It is impossible to guess the amount of dust created by the cutting, sawing, etc. of Kaylo....

This same evidence is relevant to and tends to prove OCF's bad faith in marketing Kaylo. Having assembled extensive evidence concerning the dangers of asbestos for the purpose of acquiring, and maintaining, a competitive edge and, thus, being acutely aware of its defects, OCF nevertheless marketed a product containing asbestos, touting it as safe. This marketing continued even in the face of evidence that even small amounts of asbestos were dangerous, *i.e.*, Dr. Selikoff's conclusion that only one fiber in the body could cause cancer, OCF's questioning of the accuracy of the threshold limit value relative to asbestos dust, and despite its knowledge of the "impossib[ility of] guess[ing] the amount of dust created by the cutting, sawing, etc. of Kaylo." Notwithstanding that it now contained asbestos, after 1956, OCF marketed its product as having "pleasant handling characteristics" and being "nontoxic."

The evidence before the jury also disclosed that OCF, having developed a non–asbestos containing material for use in Kaylo, declined to use it upon determining that the profit margin it produced was insufficient. Similarly, the jury was informed of OCF's profit–motivated decision not to treat Kaylo with a spray that reduced the amount of dust its handling generated. Furthermore, appellee Scruggs presented evidence concerning OCF's attitude toward replacing the asbestos content of Kaylo. That attitude is exemplified in an internal memorandum:

D.W. Ladd pointed out we have a ten million dollar Kaylo operation. He wants "us" as a team to be in the position to tell management what fibers we can use to reinforce Kaylo if and when the day arrives when the whole industry is "forced" to remove asbestos from their products. He doesn't want OCF to wait until "D" day to start looking for substitute fibers.

I told Dale we are conducting a "low gear" program in finding substitutes for asbestos. Most of our efforts are being directed toward stress corrosion.

It was also pointed out by Mr. Ladd that if and when "D" day for the removal of asbestos arrives, we won't be alone. The whole industry would be in the same boat with us. The industry may be forced, at that point, to accept a [sic] and softer product as a price they must pay for the removal of asbestos.

It is clear to me that, contrary to the majority's conclusion, the foregoing evidence, and that detailed in the majority opinion as supportive of appellee Scruggs's entitlement to compensatory damages, could have, as it did, convinced the jury by clear and convincing evidence that the appellee Scruggs was entitled to punitive damages. As such, it was more than enough to permit the jury to return the verdict that it did. To be sure, there was evidence, which had the jury believed it, would have supported a defendant's verdict; however, that evidence, as the majority recognized when evaluating its sufficiency with regard to the compensatory aspect of the case, was not such as to require a judgment in favor of OCF as a matter of law.

After conceding that the evidence in this case " 'cuts both ways,' " 343 Md. 500, 549, 682 A.2d 1143, 1167 (1996) (quoting *Godwin, supra,* 340 Md. at 378, 667 A.2d at 137), the majority observes:

Evidence of OCF's awareness of state of the art medical knowledge about asbestos includes evidence of OCF's general agreement with the state of the art knowledge that controlled and limited asbestos exposure could be safe. Evidence that OCF was concerned enough about asbestos hazards to label its Kaylo packages also demonstrates that OCF believed safe handling of asbestos would eliminate health hazards, and that OCF intended to make workers aware of the risks of Kaylo when improperly handled. Evidence that OCF was actively working to preserve its market share of thermal insulation by designing an asbes-

tos-free Kaylo provides evidence that OCF was worried about the health hazards asbestos presented and affirmatively sought to protect its users.

*Id.* Then noting that the standard of proof is clear and convincing evidence, which "requires the plaintiff to prove much more than negligence," *Zenobia, supra,* 325 Md. at 465, 601 A.2d at 655, the majority offers its view of the state of the evidence in this case:

> "At all relevant times the widespread belief was that the extent of the health risk depended, in large part, on the length and intensity of exposure.... It may be that a jury would believe that the corporate decision to adopt health warnings came too late and, even then, that it was motivated only by the desire to minimize tort liability. It may also be that a jury would believe that PCC [OCF] was not only negligent in these respects, but that it was grossly negligent. *These possible inferences or conclusions, however, do not demonstrate that PCC [OCF] made a bad faith decision to market Uniberstos [Kaylo] in conscious or deliberate disregard of the threat to the safety of the consumer. Plaintiffs have not shown by clear and convincing evidence that ... PCC [OCF] did not in good faith believe that its recommendations for exhaust ventilation, ... housekeeping, and use of respirators were reasonable protections for users."*

*Id.* at 550, 682 A.2d at 1167 (quoting *Godwin,* 340 Md. at 378–79, 667 A.2d at 137).

The majority focuses only on the evidence and the permissible inferences from that evidence favorable to OCF. It totally fails to consider the evidence which it acknowledges is favorable to appellee Scruggs or the inferences that evidence produces. Thus, the majority does not acknowledge that it was possible for the jury to draw an inference unfavorable to OCF from the evidence that it had before it indicating that OCF began the distribution of a product containing asbestos after it had amassed tremendous evidence of the dangers associated with asbestos and that, prior to the exposure of the appellee to asbestos, OCF had reason to question both the

accuracy of the applicable threshold limit value, and whether the dust generated by cutting or sawing its product was sufficient to expose users to those dangers. Certainly, a jury with that evidence could find that OCF acted in bad faith in continuing to distribute Kaylo without further study; it could have concluded that OCF, remaining willfully blind to the suspected consequences of continued use of asbestos, distributed it in conscious disregard of those consequences. Nor was the jury bound to draw the conclusions that the majority does. In any event, it is clear that the majority simply fails to explain its conclusion that the evidence is insufficient.

Moreover, the majority mischaracterizes the record in this case. Unlike the situation in *Godwin,* this case is far from a "labeling" or negligence case. Instead, in my view, the evidence in this case is such that it is the level of the knowledge possessed by OCF that is dispositive. That is so because what OCF did, it did in the name of maximizing profits and with very little, if any, regard for anything else.

I dissent.

Judges CHASANOW and RAKER have authorized me to say that they join in the views expressed herein.