814 A.2d 1007

**GARLOCK, INC., et al.**

v.

**Richard GALLAGHER, et al.**

**No. 1268, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Jan. 17, 2003.

190

192

Steven J. Parrott (Nancy L. Weller, The Parrott Firm, Annapolis, Thomas P. Bernier, John Turlik and Goldfein & Hosmer, Baltimore, on brief for appellants, Anchor Packing Co. and Garlock, Inc.) Peter A. Woolson (Deborah L. Robinson, Melodie M. Mabanta and Robinson, Woolson, P.A., on the brief for appellant, John Crane, Inc.), Baltimore, for appellants.

Edward J. Lilly (Scott Shellenberger and the Law Offices of Peter G. Angelos, on the brief for appellee, Gallagher), Baltimore, (McCarter & English, LLP, Donald S. Meringer and Brandy Peeples, on the brief for appellee, ACandS, Inc.), Baltimore, for appellees.

Argued by SONNER, PAUL E. ALPERT and CHARLES E. MOYLAN, JR., (Retired, specially assigned), JJ.

SONNER, J.

This appeal arises from the consolidated tort actions of Christine Gallagher and Mary Tamburrino, the surviving spouses of Richard Gallagher and James Tamburrino.[1] The men allegedly died from asbestos that they were exposed to in their working lives, Richard Gallagher as a pipe fitter, and James Tamburrino as a warehouseman. Although plaintiffs listed more than a dozen defendants in their original complaint, at this juncture, the active defendants are John Crane,

---

1. A third case in the consolidation involved the decedent John Grey, but there is no appeal in that matter.

Inc.; Garlock, Inc.; Anchor Packing Company; and ACandS, Inc.

Notwithstanding the consolidation of the tort actions below, some of the legal issues raised in this appeal refer only to the Gallagher plaintiffs, while others stem from the Tamburrino case. Still, there are a number of issues that overlap within the two cases. Accordingly, in an organization that makes sense to us, we have categorized the appellate questions into three sets: (I) the Gallagher issues; (II) the Tamburrino issues; and (III) the overlap issues.

## I. The Gallagher Issues

### A. Evidence at Trial

We begin with a review of the evidence presented at trial. In 1998, Gallagher was diagnosed with mesothelioma. The cancer obliterated the left pleura in his throat, encasing the lung and chest wall, and then spread to other organs in his body. He died before trial, but the jury heard from him by way of a videotaped deposition, taken some months before his death. From that videotape, the jury learned that Richard Gallagher worked as a pipe fitter for Bethlehem Steel in Sparrows Point, Maryland, from 1946 until his retirement in 1979.

The labyrinth of pipes in the steel plant carried steam and corrosive fluids, which needed to be contained and not released into the surrounding environment. For the better part of Gallagher's work life, the plant used asbestos, a natural mineral product, to insulate the pipes and maintain the flow of materials. Gallagher's primary asbestos exposure derived from gaskets, which pipe fitters use to seal the "flanges," or connections, between pipes. Gallagher explained that he cut and shaped gaskets prior to installation, and removed old gaskets by hand scraping or power grinding, two processes that produced visible dust. He identified Crane gaskets, as well as some other brands, and testified to working with these products "everyday." Moreover, Gallagher described his as-

bestos exposure from insulation, pipe covering, and cement products.

Plaintiffs buttressed Gallagher's deposition testimony with the live testimony of Andrew Youngbar, who worked with Gallagher at Bethlehem Steel for about fourteen years. Gallagher served as Youngbar's direct supervisor for a year, and the two men worked together regularly until Gallagher retired. Youngbar described Gallagher as a "hands-on supervisor."

On direct examination, Youngbar identified Crane gaskets and packing as common work materials that were placed in the "bonnet" of a valve. These products arrived at the plant in the manufacturer's packaging, along with literature discussing their content and purpose. From these enclosures, Youngbar learned that the products contained asbestos. And beyond the printed words, Youngbar recalled the "snow storm" of particles created when a gasket was removed.

Much of Youngbar's testimony focused on whether and to what extent he witnessed Gallagher working specifically with Crane products. He was sure that Gallagher had manipulated packing products because "[h]e taught [Youngbar] to use it." He also recalled Gallagher making and removing gaskets.[2] At defense counsel's prodding on cross-examination, however, Youngbar could not remember a specific instance when Gallagher used a Crane gasket or packing product. To him, the products of the various manufacturers were "interchangeable," and he could only say that Gallagher used asbestos products regularly.

Along with setting out Gallagher's exposure history, plaintiffs sought to establish the dangerousness of the asbestos

---

**2.** Apparently, Youngbar's identification at trial of Crane gaskets as a source of asbestos exposure was new; in earlier deposition testimony, he had not mentioned such products. Defense counsel moved to strike his testimony, alleging that he identified the gaskets only after hearing Gallagher's taped testimony. The court, although "troubled" by the new testimony, allowed it to stand with the understanding that defense counsel could challenge its weight before the jury.

products. First, William Longo, Ph.D., testified as an expert in the evaluation of asbestos-containing materials. He studied Crane gaskets and determined them to contain between sixty and seventy percent chrysotile asbestos.[3] Second, James Millette, Ph.D., testified as an expert in environmental science, microscopy, and the identification and quantification of asbestos fibers. He also studied a certain type of Crane gasket and determined it to contain about eighty percent chrysotile asbestos. Dr. Millette offered more complete testimony than Dr. Longo, because besides testing the asbestos content of Crane gaskets, he had studied the amount of asbestos fiber emitted into the air when workers used those gaskets in the course of routine pipe fitting. Both experts supplemented their complicated testimonials with videotaped demonstrations.

The third spoke in Gallagher's wheel of a case was medical evidence as to how his asbestos exposure harmed him. Collectively, three doctors, Samuel Hammer, M.D.; Arnold Brody, Ph.D.; and Edward Gabrielson, M.D.; explained the cause and effect relationship between asbestos and mesothelioma. They described the different types of asbestos, its chemical properties, the difference between occupational and environmental asbestos exposure, how mesothelioma develops, and the latent versus active phases of the disease. Two other doctors, Ronald Dodson, Ph.D., and Laura Welch, M.D., spoke more specifically to Gallagher's disease history. All the experts shared the opinion that Gallagher's exposure to asbestos caused the onset of his mesothelioma, which, in turn, caused his death.

The defense put forward two medical witnesses, James Crapo, M.D., and Andrew Churg, M.D., who testified primarily as to the onset of Gallagher's mesothelioma. Establishing the timing of the disease was important for determining whether Maryland's statutory cap on non-economic damages applied.

---

3. There are three types of asbestos fibers: Crocidolite, amosite, and chrysotile. All three cause mesothelioma, but crocidolite fibers are most potent, and chrysotile are least potent.

Before trial, the Gallagher plaintiffs settled their direct claims with all the defendants originally listed in the complaint, except Crane. Plaintiffs settled their claims with Garlock and Anchor with "pro-tanto" releases, which meant that any award that they achieved would be reduced by the amount of consideration paid for the releases—$365 for Garlock and $400 for Anchor. Garlock and Anchor remained in the case, however, on Crane's cross-complaint for contribution. They participated fully in the trial.

The jury found that asbestos caused Gallagher's mesothelioma, Crane's products were a substantial contributing factor in the development of the disease, and that Crane was both negligent in, and strictly liable for, the use of its products. The jury also concluded that Crane was not alone in its liability; Garlock and Anchor, along with nine other cross-defendants, owed Crane contribution.

Unbeknownst to the jury and the court, just before deliberations, Crane executed a stipulated dismissal of its cross-claims against Garlock and Anchor, pursuant to Maryland Rule 2–506. Neither cross-defendant paid any consideration for the release. Apparently, the parties signed the dismissal on April 23, 2001, following the court's recitation of the jury instructions, but they did not file it until April 25, 2001. Meanwhile, the jury returned its verdict on April 24, 2001, and the court entered final judgment in the case on June 28, 2001.

Crane's maneuver presented the court with a dispute as to how many defendants, that is, shares of liability, it should consider in computing the Gallagher award. The rub was that although Garlock and Anchor were tied to the case when the jury deliberated, according to Crane, they were no longer involved by the time the court entered the verdict. Ultimately, the circuit court ruled Crane's stipulation was invalid, counted Garlock and Anchor as distinct shareholders in the liability, and entered judgment against all three companies. The court awarded the Gallagher plaintiffs $2,157,641.52 and awarded Crane $233,418.21 each from Garlock and Anchor.

## B. Sufficiency of the Evidence

 Plaintiffs carried the burden of proving that Crane's negligence in producing its asbestos-containing products was a "substantial factor" in the development of Gallagher's death. *Eagle–Picher Indus., Inc. v. Balbos*, 326 Md. 179, 208–09, 604 A.2d 445 (1992) (quoting Restatement (Second) of Torts § 431). Crane argues plaintiffs failed to meet that burden of proof because they presented "no evidence" of the frequency of Gallagher's use of Crane's products, and "no competent expert testimony" that Crane's products, particularly its gaskets, produced respirable asbestos fibers in amounts sufficient to cause disease.

Naturally, plaintiffs read the evidence presented at trial very differently. They emphasize Gallagher and Youngbar's testimony about Gallagher's use of Crane gaskets and packing, as well as their testimony as to how its gaskets produced dust when manipulated. They also read Dr. Longo's and Dr. Millette's testimony together as proof of the dangerous asbestos content of Crane's products.

 We must review this claim of insufficient evidence through the lens of a motion for judgment, because that is how it surfaced at trial. A court may grant a motion for judgment only after it "consider[s] all evidence and inferences in the light most favorable to the party against whom the motion is made." Md. Rule 2–519(b); *see also Owens–Illinois, Inc. v. Armstrong*, 326 Md. 107, 117, 604 A.2d 47 (1992). Thus, we are not privy to dissect the evidence and weigh the credibility of its messengers, which is what Crane has asked us to do. *See Owens–Corning Fiberglas Corp. v. Garrett*, 343 Md. 500, 521, 682 A.2d 1143 (1996) (stating that "it is not the province of an appellate court to express an opinion regarding the weight of the evidence").

Plaintiffs presented evidence of: (1) Gallagher's exposure to asbestos, in the form of his deposition testimony and his co-worker's live testimony; (2) the asbestos content of Crane's gaskets, through the testimony of a handful of experts; and (3) how the exposure caused the development of cancer in

Gallagher, with the testimony of another handful of experts. That there were weaknesses in the presentation of this evidence cannot concern us; only the jury had the task of sorting out the evidence, that which was weak and that which was strong. We will not disturb its conclusion.

## C. The Verdict Sheet

■ The next alleged error concerns the verdict sheet in the Gallagher case, which read in relevant part:

5. Do you find by a preponderance of the evidence that Defendant John Crane, Inc. was negligent in the manufacture, sale, supply, and/or distribution of its asbestos-containing products?

Yes ____ No ____

(Go to question 6.)

6. Do you find by a preponderance of the evidence that Defendant John Crane, Inc. was strictly liable in the manufacture, sale, supply, and/or distribution of its asbestos-containing products?

Yes ____ No ____

Crane argues that, instead of the generic phrase "asbestos-containing products," the court should have abided its request to separate out the different Crane products that were discussed at trial because "[t]he jury may well have found exposure to one product but a defect in another." It notes that plaintiffs presented varying degrees of proof as to Gallagher's exposure to, and harm from, chrysolite gaskets, crocidolite gaskets, and packing, which left the jury's verdict vulnerable to interpretation. Indeed, it paints the verdict as a jumble of factual findings, rather than the legitimate end of an orderly thought progression. We also gather from reading the trial transcript, that beyond the outcome in Gallagher's case, Crane was concerned that future plaintiffs would use the generalized verdict as a sword of collateral attack.

■ We begin with the premise that the court's crafting of the special verdict form was discretionary. Thus, we would

have to find something very wrong with it to reverse the judgment. *See* Md. Rule 2–522(c); *Garrett,* 343 Md. at 525–26, 682 A.2d 1143. There was no such error here.

In *ACandS, Inc. v. Abate,* 121 Md.App. 590, 625–32, 710 A.2d 944 (1998) *("Abate II"), cert. denied sub nom.,* 361 Md. 232 (2000), a case in which Crane was also a defendant, the trial court used the type of verdict sheet requested here; that is, the form asked the jury in separate questions whether the defendants were liable with respect to packing and with respect to gaskets. The jury then found Crane liable for the former, but not the latter. The issue on appeal was whether the trial court should have gone further in identifying the subject products by listing their brand names. We answered "no" because the plaintiffs' burden was to prove that "exposure to visible dust from *any* asbestos-containing product was excessive." *Id.* at 631, 710 A.2d 944. As the plaintiffs proved exposure to excessive amounts of asbestos, the defendants' products that created visible dust could be "lumped together." *Id.* at 631 n. 28, 710 A.2d 944 (citation omitted).

*Abate II* did not hold that the verdict form in complex asbestos litigation must differentiate product types, even though that is what the court did in that case. To the contrary, *Abate II* confirmed that plaintiff's burden is to connect the alleged harm with the defendant's action. *Id.* at 632, 710 A.2d 944. The burden is no more and no less. Here, the court properly instructed the jury on the theories of negligence and strict liability. We must assume, then, that the jury understood its charge to determine whether Crane's products were tied in negligence and strict liability to Gallagher's death.

### D. The Verdict

█ Regardless of the propriety of the verdict sheet, everybody, including the trial judge, agreed that the jury's original verdict in the Gallagher case was incorrect. The verdict form asked the jury to delineate the compensatory damages for Christine Gallagher, first, in the survivor action, and second,

in the claim of wrongful death. For the first claim, the jury awarded $59,591 in economic loss, and for the second claim, it awarded $1,000,000. Plaintiffs conceded that the $59,591 award belonged to the wrongful death action, and that the evidence did not support the $1,000,000 award. Accordingly, at the parties' urging, the court corrected the mistakes by moving (and reducing) the $59,591 award to the wrongful death action and erasing altogether the $1,000,000 award.

Notwithstanding these corrections, however, Crane sees reversible error because "nothing could be done to correct for the obvious pervasive jury confusion these errors evidence." It concludes that "the jury simply did not understand this case or its charge." We are not so pessimistic. The jury's miscalculations affected only the award, not the finding of liability, and the court quickly and properly corrected the errors. Reversal of the judgment would have been an extreme response, indeed.

## E. The Cross–Claims

The considerations posed by this fourth claim of error are at once technical and equitable. The fundamental question is whether Crane's dismissal of its cross-claims against Garlock and Anchor, after the jury deliberated on those claims, but before the court entered final judgment, was valid. The lurking question is whether Garlock and Anchor should have been counted in slicing the total pie of liability; that is, were there ten defendants, with Crane holding one/tenth share of liability, as Crane argues, or twelve defendants, with Crane holding its share plus Garlock and Anchor's shares, or three/twelfths of the liability, as plaintiffs argue?

Initially, it may seem counterintuitive for Crane to pursue this matter on appeal. After all, the more pieces in the pie, the less liability for each tort-feasor, including Crane, and presumably Crane could collect whatever Garlock and Anchor owed to it in an action for contribution. The numbers bear this out; dividing the verdict of $2,157,641.52 by twelve shares would render Crane absolutely liable for $179,803.46, plus the

two shares totaling $359,606.92, which it could recoup from Garlock and Anchor. On the other hand, dividing the verdict by ten would render Crane absolutely liable for $215,764.15, which is $35,960.69 more than its obligation under the twelve-share approach.[4]

Crane explained to the trial court, however, that it would rather pay a "slightly" higher award, than "go out and collect from [Garlock and Anchor]" and risk being "tied up in appeals." Moreover, Crane wished to avoid "the unseemly situation of later having a plaintiff say well, look, they are collecting judgments against the same product that they put out themselves."

Having explained the impetus for this question on appeal, we begin its resolution by turning to Maryland Rule 2–506, which states in part:

RULE 2–506. Voluntary Dismissal

(a) **By notice of dismissal or stipulation.** Except as otherwise provided in these rules or by statute, a plaintiff may dismiss an action without leave of court (1) by filing a notice of dismissal at any time before the adverse party files an answer or a motion for summary judgment or (2) by filing a stipulation of dismissal signed by all of the parties who have appeared in the action.

(b) **By order of court.** Except as provided in section (a) of this Rule, a plaintiff may dismiss an action only by order of court and upon such terms and conditions as the court deems proper. If a counterclaim has been pleaded prior to the filing of plaintiff's motion for voluntary dismissal, the action shall not be dismissed over the objection of the party who pleaded the counterclaim unless the counterclaim can remain pending for independent adjudication by the court.

\* \* \*

---

**4.** This is only a rough calculation. To discern the parties' true obligations, the trial court must deduct for the various kinds of settlement releases. It also appears to have apportioned the lump sum award to the survival action, wrongful death action, and the loss of consortium claim.

(e) **Dismissal of counterclaims, cross-claims, or third-party claims.** The provisions of this Rule apply to the dismissal of any counterclaim, cross-claim, or third-party claim, except that a notice of dismissal filed by a claimant pursuant to section (a) of this Rule shall be filed before the filing of an answer.

Thus, the rule provides three ways that a claim can be terminated: (1) the party that initiated the claim may dismiss it before the opposing party responds to the suit; (2) all the parties to the action may stipulate a dismissal at any time before judgment; or (3) the court may order dismissal of the suit. Here, the claim at issue is the one filed by Crane against Garlock and Anchor, and our concern is the second of the three circumstances, where the parties stipulate dismissal.

Crane's maneuver clearly disturbed the trial court, which doubted whether the company had respected "the spirit and intent" of Rule 2–506. The court then nullified the stipulation, explaining:

This court finds that the amount recoverable from John Crane is directly linked to the number of joint tort-feasors found by the jury. Once the number of joint tort-feasors are, in fact, established, the ultimate judgment amount is determined by applying the Maryland Uniform Contribution Among Joint Tort-feasors Act. . . .

Here, Richard Gallagher signed and released 11 joint tort-feasors found liable by the jury, and it is only those 11 settlements that have any effect on the judgment amount.

In nine of these releases, the language of the release called for a pro rata reduction of the judgment amount. Accordingly, John Crane, Inc. should be given a credit of nine times the share value. That amount is a substantial reduction in the verdict.

The cases related to Garlock and Anchor are completely different than that related to John Crane. The releases signed by Richard Gallagher with Anchor and Garlock state that a dollar for dollar reduction be credited to John Crane for the consideration by Garlock and Anchor, thus creating

... pro tanto releases. By purchasing pro tanto releases and having a jury finding them liable on a cross-claim, Garlock and Anchor clearly in this court's mind share the verdict. The credit John Crane receives by Garlock and Anchor is only a dollar for dollar reduction off the verdict amount.

The court finds the total amount of damages to Richard Gallagher and his family has been determined by the finder of facts in the case, that is, the jury.

In this case that number is 12. John Crane, Inc. and the 11 cross-defendants who Crane requested be placed on the verdict are all joint tort-feasors.

Based on that, the court finds the appropriate number is 12 as the plaintiffs contend and not 10 as John Crane has contended.

I'm moved by the argument by the plaintiff about the equity of this. I find it striking that we can proceed through trial to present this case on 12 joint tort-feasors both in verdict sheets and closing argument and then come back here and request that it be instead of 12, 10, and this court finds that it is not only fundamentally unfair, but violative of the express language of 2–506(a).

As we read the court's ruling, although it paid lip service to the "express language" of Rule 2–506, it was really concerned that Crane had engaged in gamesmanship to lessen plaintiffs' award. We, however, cannot reconcile the court's conclusion with other cases interpreting the rule. Indeed, just a few months before the parties filed their briefs in this case, we issued *Milburn v. Milburn*, 142 Md.App. 518, 790 A.2d 744 (2002), in which we held that minor children were not "parties" to a divorce action, and therefore, they could not challenge their parents' stipulated dismissal of the action under Rule 2–506(a). The circuit court in *Milburn* had rejected the stipulated dismissal, which sprang from the parents' reconciliation, because it did "not believe it to be in the children's best interests." *Id.* at 522, 790 A.2d 744.

We noted that Rule 2–506 was "clear and unambiguous." *Id.* at 533, 790 A.2d 744. We further explained:

> The term "party" is not defined in the Maryland Rules; however, those persons who are entered on the record as plaintiff or defendant are generally considered the parties. Any other persons who may be affected by the outcome of the cause of action, either indirectly or consequently, although interested persons, *will not be considered parties.*

*Id.* (citations omitted). Thus, although the minor children had an important stake in the course of their parents' divorce proceeding, that interest alone did not elevate them to the status of "party."

Also noteworthy is *Murphy v. Board of County Commissioners,* 13 Md.App. 497, 284 A.2d 261 (1971), an automobile tort case, in which the defendant filed a cross-claim, only to seek dismissal of the claim at the close of all the evidence, but before instruction of the jury and deliberation. Plaintiff's counsel objected to the dismissal because "he deemed it wise as a matter of strategy that [the cross-claim] stay in." *Id.* at 507, 284 A.2d 261. The trial court approved the dismissal by written order, and we affirmed.

Although the dismissal in *Murphy* was effectuated by a court order, not a stipulated dismissal, what we said then rings true in this case: "We know of no principle or rule that a plaintiff has any rights arising from cross-claims among defendants." *Id.* at 508, 284 A.2d 261; *see also Kenrose Mfg. Co. v. Whitaker Co.,* 53 F.R.D. 491, 493 (W.D.Va.1971) (granting court order for dismissal of third-party claim, given third-party plaintiff and third-party defendant's desire to dismiss claim, and despite direct plaintiff's objection to the dismissal), *aff'd,* 512 F.2d 890 (4th Cir.1972). It is important to remember that cross-claims are not mandatory; we allow them to be appended to the primary case for the sake of efficiency, but they just as well may be pursued in a second trial. They are tied in time to the primary case, but retain an independent claim status.

■ Here, the Gallagher plaintiffs were parties to the main case, but they were not parties to the cross-claims, which began with Crane and ended with Garlock, Anchor, and nine other cross-defendants. Plaintiffs had executed pro rata releases with nine of the cross-defendants. That meant that whatever award plaintiffs achieved would be reduced by nine shares. *See Swigert v. Welk*, 213 Md. 613, 619, 133 A.2d 428 (1957); Uniform Contribution Among Joint Tort–Feasors Act ("UCTA"), Md.Code (1973, 1998 Repl.Vol.), Cts. & Jud. Proc., § 3–1405. Garlock and Anchor, however, executed pro tanto releases with plaintiffs, which meant that the verdict would be reduced not by the percent of their share, but by the actual amount of consideration that they paid for the release, which was $765 combined. *See* UCTA at § 3–1404. As Crane explained to the trial court, by these various means of settlement, all the cross-defendants "had purchased complete 'peace' " with plaintiffs.

To be sure, the Gallagher plaintiffs held an interest beyond the verdict in the outcome of the cross-claim, but like the minor children in *Milburn* that rendered them merely "interested persons," not parties. Once the actual parties to the cross-claim stipulated a dismissal, the Gallagher plaintiffs—and the trial court—had no voice to contest it.

In *Collier v. Eagle–Picher Indus., Inc.*, 86 Md.App. 38, 44, 585 A.2d 256 (1991), following the verdict in favor of five plaintiffs, the trial court presided over a proceeding to determine the liability of several entities that had settled with plaintiffs before or during trial. The court did not allow plaintiffs to participate in the determination of which of the settled defendants were joint tort-feasors. Plaintiffs, however, did participate in calculating the final awards by offering their view as to what reductions should be made in accordance with the earlier settlements and releases. This Court held that plaintiffs were entitled to participate in both phases of the proceeding, not just the second part. We stated:

Whether those defendants, or any of them, were joint tort-feasors affected not only the rights and obligations of contri-

bution among the defendants but also the extent of any reductions in the verdicts against [the direct defendants]. *Id.* at 58, 585 A.2d 256.

We can only reiterate the quoted language today; plaintiffs do indeed have an interest in deciphering the number of joint tort-feasors and the amount each liable entity owes. That interest does not empower them, however, to force a defendant to prosecute a claim that may benefit plaintiffs. In other words, a plaintiff's right under *Collier* to name the wrongdoers once a wrong has been confirmed, does not include the right to revive a claim against a wrongdoer with whom plaintiff settled before trial.

Of course, we do not intend, with this discussion, to sanction any kind of dishonorable trial strategy. It would be troubling if, as plaintiffs allege, Crane purposefully included Garlock and Anchor to benefit from their testimony and argument at trial, and then purposefully removed them from the case once it knew the jury's verdict. But Crane denies such gamesmanship. Rather, it explains on appeal: "It was in John Crane's interest for Garlock and Anchor to obtain a *Swigert* release and reduce any possible judgment by two full shares. When *Swigert* releases were not given to Garlock and Anchor, John Crane agreed to dismiss them." Moreover, although Crane arranged for the dismissal before deliberations, it waited until the jury returned with its verdict because to delete the parties during deliberations "would have been strange to the jury."

Accordingly, we hold the trial court erred in ruling that the stipulated dismissal was a nullity, and that means it must recalculate the amount of the final award. At the time of entering judgment, there was one liable defendant, Crane, and nine liable cross-defendants. Thus, pursuant to the UCTA, *supra,* the court must divide the total verdict by ten to arrive at each share of liability. From there, to calculate the final amount that Crane owes, it will deduct for the various releases effectuated before trial. Our holding further reverses the trial court's order that reinstated the contribution judgments against Garlock and Anchor as cross-defendants.

## *II. The Tamburrino Issues*

### A. Evidence at Trial

Of course, plaintiffs for James Tamburrino benefitted from the same medical and scientific evidence detailed above in reference to Richard Gallagher. They also presented Tamburrino's particular asbestos history, which included his job as a warehouseman for General Motors, Inc. at its plant in Halethorpe, Maryland. Tamburrino was responsible for transporting materials around the plant, which meant he brought insulation and gaskets to pipe fitters.

Tamburrino died of mesothelioma in 1994. Unlike the Gallagher case, plaintiffs did not present any testimony from Tamburrino himself, choosing, instead, to build his exposure history through the testimony of Raymond Reprogel, a co-worker. Reprogel cleaned parts throughout the plant, and later assembled and repaired those parts. He watched Tamburrino deliver equipment "everywhere" in the plant and described the working environment as "[a]lways dusty." Reprogel identified Garlock as the manufacturer of the gaskets used in the plant, and he believed those products contained asbestos because they resembled the brake linings in his car.

By the start of trial, the Tamburrino plaintiffs had settled their claims with all the original defendants except ACandS. As in the Gallagher case, however, Garlock remained in the case as a defendant to ACandS's cross-complaint for contribution. The jury found ACandS liable in negligence and strict liability and awarded the Tamburrinos $2,051,319.53 in damages. It also found that Garlock owed contribution as a joint tort-feasor.

### B. Sufficiency of the Evidence

This issue pits Garlock, the cross-defendant, against ACandS, the primary defendant. Garlock challenges whether plaintiffs and ACandS proved that Garlock's products were a substantial factor in the development of Tamburrino's illness. What we said above in the Gallagher case about sufficiency claims in the garb of motions for judgment applies here; that

is, we will not weigh the evidence, but only ensure that there was "legally relevant and competent evidence, however slight, from which a rational mind could infer a fact in issue." *Owens–Corning v. Walatka,* 125 Md.App. 313, 342, 725 A.2d 579 (citation omitted), *cert. denied,* 354 Md. 573, 731 A.2d 971 (1999).

Plaintiffs set out to prove that Tamburrino transported asbestos-containing products in an asbestos-filled environment. Because he did not work directly with the harmful products, he was a "bystander" victim.

> Whether the exposure of any given bystander to any particular supplier's product will be legally sufficient to permit a finding of substantial-factor causation is fact specific to each case. The finding involves the interrelationship between the use of a defendant's product at the workplace and the activities of the plaintiff at the workplace. This requires an understanding of the physical characteristics of the workplace and of the relationship between the activities of the direct users of the product and the bystander plaintiff. Within that context, the factors to be evaluated include the nature of the product, the frequency of its use, the proximity, in distance and in time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff to the use of that product.

*Balbos,* 326 Md. at 210, 604 A.2d 445.

Raymond Reprogel testified that Tamburrino transported Garlock gaskets and that his maneuvers around the plant consistently exposed him to "dusty" air. This evidence, even if anemic, was worthy of jury consideration. Like Tamburrino, the plaintiff in *Garrett,* 343 Md. at 526–30, 682 A.2d 1143, successfully relied upon the testimony of co-workers and medical experts to build its case. Accordingly, accepting all of the weaknesses in Reprogel's testimony that Garlock delineates in its brief, the trial court still acted appropriately in sending the case to the jury and denying Garlock's motion for judgment.

## C. Calculation of the Final Judgment

Following the jury's decisions in the Tamburrino case on the primary and cross-claims, the trial court divided the plaintiffs' award of $2,051,319.53 into three shares, representing: (1) ACandS, the direct defendant; (2) Porter Hayden, a company that settled with plaintiffs via a pro rata release; and (3) Garlock, the cross-defendant that settled with plaintiffs via a pro tanto release. The court purportedly acted according to the UCTA, which provides for contribution among joint tort-feasors. *See* Md.Code (1973, 1998 Repl.Vol.), Cts. & Jud. Proc., §§ 3–1401–1409; *see also Collier*, 86 Md.App. at 52–56, 585 A.2d 256 (discussing the Maryland history of contribution among joint tort-feasors). In the court's view, because the jury assigned liability to all three companies, each one was responsible for one-third of the verdict. Garlock now urges us to reconsider the court's calculations because of the nature of the release that it signed with the Tamburrino plaintiffs before trial.[5]

We begin with the UCTA, which defines joint tortfeasors as "two or more persons jointly or severally liable in tort for the same injury to person or property whether or not judgment has been recovered against all or some of them." *See* § 3–1401(c). In the straight-forward scenario, one tort-feasor collects from a second tort-feasor, after the former has paid its proportional share of the common liability. *Id.* at § 3–1402(b); *see also Lerman v. Heeman*, 347 Md. 439, 445–47, 701 A.2d 426 (1997).

The process is complicated, however, when, as here, plaintiffs have settled with one, but not all, of the tort-feasors. In those cases, section 3–1404 of the UCTA provides:

[A] release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides, but it

---

**5.** The Tamburrino plaintiffs oppose Garlock on this issue, as does ACandS. We find curious the position of ACandS, because it joined Garlock's post-trial motion seeking amendment of the court's calculation of shares.

reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

This provision ensures that verdicts reflect what is paid and promised in settlement agreements.

When a pro rata release is executed, a defendant provides a plaintiff with consideration to terminate its liability and to obtain a plaintiff's assent that any verdict it receives against any other tort-feasors will be reduced to the extent of the settling defendant's proportional share. In this way, the settling defendant frees itself of its liability to the plaintiff and of its contribution debt to the other tort-feasors.

If the pro rata release includes the admission that the settling defendant is a tort-feasor, a plaintiff's verdict will be automatically reduced by the amount of the settling defendant's pro rata share. *See Jones v. Hurst*, 54 Md.App. 607, 459 A.2d 219 (1983). If, however, no such admission is included, the pro rata reduction will occur only if the trier of fact finds the settling defendant liable. *See Swigert v. Welk*, 213 Md. 613, 133 A.2d 428 (1957). Either way, a pro rata release guarantees that the settling defendant will be counted in divvying the total pie of liability.

As Garlock points out, however, it executed a pre-judgment, pro tanto release for $25,000, which meant that it gave consideration in exchange for plaintiffs' termination of its suit against Garlock, but it did not seek release from any contribution it might owe the other alleged tort-feasors. Thus, when the parties took their seats at the beginning of trial, the Tamburrino plaintiffs could not expect a judgment in their favor against Garlock because it had extinguished that claim, but ACandS, as the remaining tort-feasor in the case, could anticipate contribution from Garlock for any verdict levied against it.

Because Garlock was not a party to the primary case, nor a shareholder in that liability, the trial court should not have

counted it as a share in dividing the verdict. The trial court must correct that mistake on remand.

## III. The Overlap Issues

### A. Peremptory Jury Strikes

We first address Anchor's argument that the court should have granted it and Garlock separate peremptory jury strikes because the cross-defendants' interests were adverse to those of the primary defendants—Crane in the Gallagher case and ACandS in the Tamburrino case. Although we accept the path that Anchor has directed us to take to resolve this issue, we do not agree with its destination.

Maryland Rule 2–512(h) governs the allocation of peremptory challenges in civil actions. It provides that when there are multiple defendants in a case, they are to be considered as "a single party," unless the court determines that the "adverse or hostile interests" between them justifies "allowing to each of them separate peremptory challenges." *Id.* The rule envisions a two-step analysis. "First, the court must make a factual finding of adverse or hostile interest, and second, the court, in its discretion, must determine whether that interest would justify allowing the added challenges." *Kloetzli v. Kalmbacher*, 65 Md.App. 595, 599, 501 A.2d 499 (1985). Thus, an adverse interest does not *per se* warrant added peremptory strikes. The party requesting extra peremptory strikes carries the burden of proving the adverse or hostile interest. *Id.* This is clearly a discretionary matter for the trial court. *See id.* at 598–99, 501 A.2d 499; *Balbos*, 326 Md. at 191–92, 604 A.2d 445.

Here, the trial judge acknowledged that the cross-defendants had different interests than the primary defendants, but he did not consider those interests "specifically adverse enough or hostile enough to allow the additional strikes." Indeed, as plaintiffs explain on appeal, all the defendants manufactured and distributed the same type of product, and they shared the common purpose of persuading the jury that those products did not emit respirable asbestos fibers. Given

the discretion afforded the trial court in this arena, and the reasonable basis for its decision in this case, we will not disturb its ruling.

## B. Testimony of Andrew Churg, M.D.

[redacted] Next, Garlock argues the trial court erred in excluding portions of the videotaped deposition testimony of Andrew Churg, M.D., a pathologist. Apparently, in 1997, a group of law firms that practiced asbestos litigation in Maryland convened for the deposition of Dr. Churg to ascertain his specialized views on the rate of tumor growth in mesothelioma. His opinion was important for determining whether the statutory cap would work to limit non-economic damages for a particular plaintiff.

During the deposition, a Garlock attorney interjected questions as to whether the exposure levels from Garlock gaskets could be a substantial contributing factor in the development of mesothelioma. Many of the other lawyers objected that those questions exceeded the scope of the deposition. They believed Dr. Churg was qualified to speak to the medical question of tumor growth, not the loaded issue of which asbestos company was responsible for what harm. The confrontation may have faded into deposition nether lands, except that Dr. Churg answered the questions favorably to Garlock; he stated that he did not believe the Garlock gaskets could be a substantial factor in the development of mesothelioma.

At the Gallagher and Tamburrino trial, the court admitted Dr. Churg's testimony regarding the rate of tumor growth in mesothelioma. Persuaded by ACandS, however, it declined to admit those portions of Dr. Churg's cross-examination that specifically discussed Garlock gaskets. The court ruled:

> If [Dr. Churg] wishes to testify in these proceedings, the Court welcomes him to testify in these proceedings, but I will not allow the deposition transcript to be in because I do not find that an appropriate opportunity to cross-examine the witness on the critical question that he will . . . be asked has been afforded, and so on that basis I will deny the

request for Garlock to read into the record a question and answer relating to that portion of the proceeding.

The trial court rendered its decisions after a full briefing from the parties as to why the 1997 deposition was arranged and what happened at the deposition, as well as to the equity of admitting the suspect testimony.

■ The court's ruling entailed judicial discretion, or "that power of decision exercised to the necessary end of awarding justice and based upon reason and law, but for which decision there is no special governing statute or rule." *Goodman v. Commercial Credit Corp.*, 364 Md. 483, 491, 773 A.2d 526 (2001) (citation omitted). Accordingly, we review the decision for "the soundness and reasonableness with which the discretion was exercised." *Id.* Because the ruling was informed, and not based on "an error of law or some [other] serious mistake," we uphold it. *Brown v. Contemporary OB/GYN Assocs.*, 143 Md.App. 199, 252, 794 A.2d 669 (citation omitted), *cert. denied* 369 Md. 659, 802 A.2d 438 (2002). Indeed, a trial judge's decision to admit or exclude expert testimony is so clearly discretionary, that it rarely amounts to reversible error. *Id.* (citations omitted).

## C. State of the Art

■ Garlock also asks us to reverse the judgment because plaintiffs and the primary defendants failed to show that Garlock knew its asbestos products were dangerous at the time Gallagher and Tamburrino worked with them; that is, Garlock contends the "state of the art" evidence was inadequate. *See ACandS, Inc. v. Godwin*, 340 Md. 334, 395, 667 A.2d 116 (1995) (explaining that in a failure to warn action, "a plaintiff must show that the defendant knew or should have known that distribution of the product involved an unreasonable risk of causing physical harm to the consumer"). Like the sufficiency claims discussed above, we must address this claim through the lens of a motion for judgment.

Plaintiffs presented their state of the art evidence through John Dement, Ph.D., who reported on what the medical and

scientific community understood in the first half of the twentieth century about the link between asbestos and cancer. Specific to the Tamburrino case, plaintiffs also admitted workers' compensation claims, internal memoranda, and correspondence that spoke to ACandS's state of the art knowledge. ACandS countered with its own expert, William Dyson, Ph.D.

Garlock identifies various holes in plaintiffs' evidence, including a lack of testimony as to when the commercial world understood that asbestos fibers would harm bystanders, like Tamburrino, in addition to the people who used the products, like Gallagher. It also argues that all of the state of the art evidence focused on insulation products, without reference to gasket products.

Nonetheless, we are persuaded that sufficient evidence was produced to send the issue to the jury. As the Court of Appeals explained in *Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420, 444, 601 A.2d 633 (1992), "all manufacturers are held to the knowledge and skill of an expert." In that case, the Court plainly held that the state of the art knowledge of one asbestos manufacturing company was attributable to a second company in the same business at the same time. *Id.* at 445, 601 A.2d 633. In other words, defendants are responsible "not only [for] discoveries by the general scientific community or discoveries reflected in the general scientific literature, but also the discoveries by scientists or experts employed by other manufacturers." *U.S. Gypsum Co. v. Mayor of Baltimore*, 336 Md. 145, 165, 647 A.2d 405 (1994). Here, then, the specific evidence against ACandS, along with the general testimony of two experts, left the jury with a legitimate question as to what Garlock knew about its products and whether it acted lawfully in response to that knowledge.

## D. Statutory Cap on Non-economic Damages

Nearly a month after the parties filed their briefs in this case, the Court of Appeals issued *John Crane, Inc. v. James Scribner*, 369 Md. 369, 800 A.2d 727 (2002), which answered the important and recurring question of when Mary-

land's statutory cap on non-economic damages applies to asbestos litigation. The statutory cap is set at $350,000 for all personal injury claims "in which the cause of action arises on or after July 1, 1986." Md.Code (1973, 1998 Repl.Vol., 2001 Supp.) Cts. & Jud. Proc. § 11–108(b)(1). As the Court of Appeals explained, in asbestos litigation, where the subject injury is cancer, we have no certain way of knowing when the injury arose. *See Crane,* 369 Md. at 391, 800 A.2d 727. For the sake of statutory integrity and practicality, however, the Court adopted "the exposure approach, which . . . looks to when the plaintiff first inhaled asbestos fibers that caused cellular changes leading to the disease." *Id.* at 390, 800 A.2d 727. As long as plaintiff's last exposure to asbestos "undisputedly" happened before July 1, 1986, the cap does not apply, as a matter of law. *Id.* at 394, 800 A.2d 727.

Here, the latest point in time that Gallagher could have been exposed to asbestos was 1979, the year he retired. Tamburrino likewise retired before 1986. That marks their exposure well before 1986, and easily freed plaintiffs' litigation from the grips of the statutory cap. We do not need to say anything more about the actual application of the cap at trial, or the court's instruction to the jury on this matter.

## IV. Conclusion

Having reviewed all the issues raised in the complex web of briefs in this case, we affirm the trial court's evidentiary and trial management rulings. We remand its calculation of the judgment in the Tamburrino case. We reverse, however, the court's refusal to accept the defendants' stipulated dismissal in the Gallagher case, as well as its calculation of the award for that portion of the proceeding.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**APPELLANTS TO PAY 3/5 OF ALL COSTS AND APPELLEES TO PAY 2/5 OF ALL COSTS.**